[No. D055215. Fourth Dist., Div. One. Oct. 19, 2012.]

PRESERVE WILD SANTEE et al., Plaintiffs and Appellants, v.
CITY OF SANTEE et al., Defendants and Appellants;
HOMEFED FANITA RANCHO, LLC, Real Party in Interest and Appellant.

[No. D061030. Fourth Dist., Div. One. Oct. 19, 2012.]

PRESERVE WILD SANTEE et al., Plaintiffs and Respondents, v.
CITY OF SANTEE et al., Defendants and Appellants;
HOMEFED FANITA RANCHO, LLC, Real Party in Interest and Appellant.

---

**COUNSEL**

John T. Buse, Kevin K. Johnson, Jeanne L. MacKinnon; and Michael D. Fitts for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Best Best & Krieger, Lindsay D. Puckett, Michelle Ouellette and Shawn D. Hagerty for Defendants and Appellants.

Allen Matkins Leck Gamble Mallory & Natsis, Jeffrey A. Chine and Heather S. Riley for Real Party in Interest and Appellant.

---

**OPINION**

**McCONNELL, P. J.—**

## INTRODUCTION

Preserve Wild Santee, Center for Biological Diversity, and Endangered Habitats League, Inc. (collectively, plaintiffs), challenged the certification by the City of Santee (City) of a final environmental impact report (EIR) for a development project in the City's Fanita Ranch area (project), claiming the project failed to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) in several respects.[1] The trial court found merit to one claim—that there was insufficient evidence to support the EIR's conclusion the project's fire safety impacts were less than

---

[1] Further statutory references are also to the Public Resources Code unless otherwise stated.

significant. The trial court issued a limited writ of mandate (limited writ) directing the City to bring this aspect of the EIR into compliance with CEQA and stayed further activities on the project until the City did so. The trial court subsequently determined plaintiffs were the prevailing parties in the litigation and awarded them costs under Code of Civil Procedure section 1032, subdivision (b), as well as attorney fees under Code of Civil Procedure section 1021.5.

On appeal, plaintiffs reassert several claims raised below, including that the EIR improperly deferred mitigation of the project's impacts on the Quino checkerspot butterfly (Quino) and inadequately analyzed the project's water supply impacts. They also contend the trial court was not permitted to issue the limited writ and, instead, was required to vacate the City's certification of the EIR and all related project approvals.[2]

The City and real party in interest HomeFed Fanita Rancho, LLC (HomeFed or developer),[3] contend the trial court erred in determining plaintiffs were the prevailing parties and awarding them costs and attorney fees.[4] They alternatively contend we must reverse the attorney fee award because the trial court failed to explain how it reached the award amount.[5]

We conclude the EIR improperly deferred some of the mitigation for the project's Quino impacts and inadequately analyzed the project's water supply impacts. Although we conclude the trial court may, in appropriate cases, remedy CEQA violations by issuing a limited writ, we question whether this was an appropriate case since the flaw in the EIR's fire safety impacts analysis affected the entire project and the project's fire safety impacts interrelate with its impacts on biological resources, such as the Quino and grasshopper sparrow, requiring careful vegetation management for their preservation. We need not decide the matter, however, since the trial court has

---

[2] The project approvals included a development review permit, a vesting tentative map, five conditional use permits, and a development agreement.

[3] The original real parties in interest were Barratt American, Inc., and Fanita Ranch, L.P. Following bankruptcy and foreclosure proceedings, the parties stipulated HomeFed is the current real party in interest.

[4] Because the trial court awarded plaintiffs attorney fees several months after it awarded plaintiffs costs, the City and developer filed their appeal of the attorney fee award separately from their appeal of the cost award. We consolidated the appeals on our own motion.

[5] While this appeal was pending, the City filed a return to the limited writ. There have been subsequent trial court proceedings related to the return and the adequacy of the City's efforts to comply with the limited writ and CEQA. We grant plaintiffs' request for judicial notice of the trial court's ruling in the subsequent proceedings, which found the City's efforts to comply with the limited writ and CEQA unsatisfactory. We also grant the City and the developer's requests for judicial notice of the amended judgment and the amended peremptory writ of mandate in the subsequent proceedings showing the trial court directed the City to decertify the EIR and set aside all project approvals. (Evid. Code, §§ 452, subds. (d) & (h), 459, subd. (a).)

recently ordered the City to decertify the EIR and set aside the project approvals as part of subsequent trial court proceedings (see fn. 5, *ante*). Finally, we conclude the trial court correctly found plaintiffs were the prevailing parties in this litigation and did not err in awarding them attorney fees and costs below. We similarly award them attorney fees and costs on appeal and remand the matter to the trial court for a determination of the amount of such fees and costs.

## BACKGROUND

*Environmental Setting*

The project covers 2,600 acres of undeveloped land in Santee, north of State Route 52 and west of State Route 67. The land contains several different biological communities "including wetland (e.g., seasonal basins and freshwater marsh), riparian (e.g., southern willow scrub, coast live oak riparian woodland, sycamore woodland, mule fat scrub), southern mixed chaparral, coastal sage scrub, disturbed coastal sage scrub, grasslands, disturbed or graded areas, and rock outcroppings."

The project would develop approximately 970 acres of the land into 1,380 single-family dwelling units and approximately 230 acres into a pedestrian-oriented village center with 15 live/work units as well as community-serving recreational resources, including a 10-acre lake. The remaining approximately 1,400 acres of land would become an open space preserve (preserve).

In certifying the EIR, the City found the project would result in significant unavoidable air quality, traffic circulation, and cumulative climate change impacts. It adopted a statement of overriding considerations concluding the project's benefits outweighed these adverse impacts. The City found the project's other environmental impacts to be either less than significant or mitigated to a level of less than significant.

This appeal involves the project's impacts to fire safety, certain biological resources, and water supply. We, therefore, confine our summary to these areas.

*Fire Safety Impacts*[6]

The project is located in a declared high fire hazard zone due to the vegetation type, fire history, and rough topography in the area. The project

---

[6] Although neither party challenges the trial court's ruling regarding the EIR's treatment of the project's fire safety impacts, we include a summary of the facts underlying this issue to provide context for our discussion of the parties' claims related to the trial court's use of the limited writ remedy and its awards of attorney fees and costs to plaintiffs.

site has burned many times in the past and it is expected to burn again in the future. Under established thresholds of significance, the project would have significant adverse fire safety impacts if it exposed people or structures to a significant risk of loss, injury, or death from wildfires.

To address the project's fire safety risks, the developer prepared a fire protection plan (fire plan) for the project. The fire plan's objective was to ensure the project's structures could survive wildfires without structure loss, without loss of life, and without intervention from firefighting personnel, who may be unavailable during a wildfire due to a high demand for their services.

To achieve its objective, the fire plan relied on multiple strategies, including: (1) building structures with fire-resistant materials and sprinklers; (2) creating and maintaining "firewise" landscaping zones around structures; and (3) managing the amount of potential fuel in open space areas with prescribed burns or goat grazing. The EIR concluded the project's fire safety impacts were less than significant chiefly because of the fire plan.

However, when the City approved the project, it did not adopt the open space fuel management portion of the fire plan. Because the EIR's fire safety analysis depended entirely on the City's implementation of the fire plan and the fire plan depended in key part on periodic open space fuel modification with either prescribed burns or goat grazing, the trial court concluded there was insufficient evidence to support the EIR's conclusion the project did not have significant fire safety impacts.

*Biological Resources Impacts*

*Analysis of Cumulative Impacts*

The Multiple Species Conservation Program (MSCP) covers 900 square miles in San Diego County, including the project site and surrounding property. Participants in the MSCP include the City, the City of San Diego, the County of San Diego, and nine other local jurisdictions. Each jurisdiction implements its portion of the MSCP by developing a "subarea plan" describing the jurisdiction's specific implementing mechanisms, preserve boundaries, and species and habitats protections consistent with the MSCP framework plan.

Once adopted by the jurisdiction and approved by the U.S. Department of Fish and Wildlife and California's Department of Fish and Game (wildlife agencies), the subarea plan in conjunction with the MSCP operates as a habitat conservation plan consistent with the federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) and a natural community program

consistent with California's Natural Community Conservation Planning Act (Fish & G. Code, § 2800 et seq.). The purpose of the plans is to protect natural communities and species while allowing a reasonable amount of economic development.

At the time the City certified the EIR, the City of San Diego and the County of San Diego had approved subarea plans. The City had drafted, but had not adopted, its subarea plan. The draft subarea plan covers 15 plant and 33 wildlife species. Relying on a combination of hard-line protection areas and soft-line criteria-based protection zones, it estimates the location of future development and habitat preservation, and summarizes the mitigation and management requirements necessary for consistency with the MSCP.

The draft subarea plan is divided into five subunits: the San Diego River subunit, the Rattlesnake Mountain subunit, the Mission Trails subunit, the Magnolia Summit subunit, and the Fanita Ranch subunit. The project site is located in the Fanita Ranch subunit.

In assessing the project's cumulative impacts to biological resources, the EIR noted most of the surrounding property south of the project site is completely developed. There were no projects proposed for the surrounding property south and east of the project site, which had limited development potential as it was included in the City's draft subarea plan conservation planning. As to surrounding property within the County of San Diego's jurisdiction, there was no anticipated development on property north of the project, but property northeast of the project could be developed. Finally, as to surrounding property within the City of San Diego's jurisdiction, there were proposals to develop property southwest of the project and expand a landfill west of the project.

Because both the City of San Diego and the County of San Diego have approved subarea plans, the EIR assumed any projects approved within these jurisdictions would be consistent with their subarea plans and, by implication, the MSCP. Although the City did not have an approved subarea plan, it had committed through its general plan to applying the MSCP conservation standards and the draft subarea plan to projects within its jurisdiction. Consequently, the EIR assumed any projects approved within the City's jurisdiction would be consistent with either the City's draft subarea plan, if adopted, or the MSCP's guiding principles, which are uniform throughout the MSCP area. Based on these assumptions, the EIR concluded the project's

impacts to biological resources were not cumulatively considerable, except as to the grasshopper sparrow, which the EIR stated was not covered by the draft subarea plan.[7]

*Mitigation of Quino Impacts by Active Management of Species Within Preserve*

The Quino is classified as an endangered species. It requires large, unfragmented areas of habitat generally consisting of "open scrub vegetation with larval host plants, nectar sites, and small to large topographic rises in close proximity." Among its significant impacts to biological resources, the project is expected to directly impact approximately 991.1 acres of potential Quino habitat. To mitigate this impact, the EIR specifies the developer must preserve 1,235.2 acres of onsite habitat suitable for the Quino and must install fencing along certain trails, which will deter access to an area in the preserve where a Quino was once sighted. In addition, the developer must acquire approximately 110 acres of offsite mitigation property that either supports the Quino or is proven to have a high potential to support the Quino.

The preserve will be protected by a conservation easement and managed in perpetuity by a habitat management plan (habitat plan) approved by the City and the wildlife agencies. At a minimum, the habitat plan must be a long-term plan for management of the preserve property "that accomplishes the goal of maintaining appropriate, high-value, native plant communities." It must include the location of offsite mitigation property, the language of the conservation easement, the plan for long-term preserve management, the responsibilities of the preserve manager, and the funding mechanism for the preserve. In addition, it must "address management and monitoring of vegetation communities through specific minimum survey and management requirements." It must also "discuss appropriate fencing or other barriers to protect certain sensitive resources," "designate and describe all permitted land uses and activities" within the preserve and "how impacts to preserve vegetation communities will be avoided," "include management measures for five [specified] sensitive plant species . . . to maximize the likelihood of their long-term viability," and include a Quino management section providing for active management of the Quino within the preserve.

To show the intended management program for the preserve, the City circulated a draft habitat plan. The draft habitat plan incorporated the draft EIR's requirements for it, and described the responsibilities of the preserve

---

[7] There is conflicting information in the record on this point. Table 1-1 in the draft subarea plan states the grasshopper sparrow is not covered by the plan, but table 3-1 states that the species is covered. Table 9 and section 6.2.4 of the EIR's biological resources technical report also state the grasshopper sparrow is covered by the draft subarea plan.

manager, which were generally to execute the approved habitat plan. The draft habitat plan also described the basic approach for managing biological resources within the preserve, which was to allow ecological processes to occur naturally while managing the effects of human recreational uses of the preserve property. Generally, the anticipated management activities included maintenance of trails and fences, control or removal of nonnative species, and restoration of disturbances caused by humans or natural events (e.g., fires and floods).

Related to the Quino, the anticipated management activities included nonspecific actions to promote Quino habitat on slopes within the preserve where host and nectar plants are present at significant densities. The antici-pated management activities for the Quino additionally included using host and nectar plants along with the creation of thermoregulation sites at a proposed seasonal basin mitigation site. Although the developer agreed to fund the Quino-related management activities, the draft habitat plan indicated the timing and other specifics for undertaking the activities would be subject to the discretion of the preserve manager based on prevailing environmental conditions.

The draft habitat plan also lists the special status species known to occur or that have the potential to occur within the preserve and relevant information about each species, including special management considerations. For the Quino, whose primary habitat is sparsely vegetated hilltops, ridgelines, and rocky outcrops, the draft habitat plan states the key consideration is proper vegetation management. According to the draft habitat plan, periodic fire or other vegetation management, such as grazing, is needed to keep the habitat open, but cannot occur too frequently or it will impact larvae and/or promote exotic, invasive species. The draft habitat plan does not discuss how the vegetation will be managed, given the City's decision not to permit pre-scribed burns or grazing in the open space area.

Subsequent to the release of the draft habitat plan, the developer prepared a report "discussing monitoring and management actions to actively conserve Quino on-site." After an initial review of this report, the wildlife agencies were not convinced the proposed actions were sufficient and indicated the developer needed to revisit them. The wildlife agencies' concerns prompted the EIR's requirement for the inclusion of the Quino management section in the approved habitat plan.[8]

---

[8] The wildlife agencies conveyed their concerns in a letter commenting on the draft EIR. The City viewed these concerns as relating solely to the treatment of the Quino in its draft subarea plan and not to the draft EIR's treatment of the species. Consequently, the City did not directly respond to these concerns. However, the wildlife agencies' concerns are necessarily related to the Quino's treatment in both documents because, as the City and the developer

*Acquisition of Offsite Mitigation Property*

As part of the mitigation for the project's biological resources impacts, the EIR requires the developer to acquire 209.6 acres of offsite habitat directly contributing to regional conservation efforts. The mitigation property must consist predominantly of coastal sage scrub, but may include some chaparral and grassland habitats. Approximately 100 acres of the mitigation property must be adjacent to the project site within the north Magnolia Summit subunit of the City's draft subarea plan. As discussed *ante*, the remaining property must either support the Quino or be proven to have a high potential to support the Quino. It must also, if feasible, be in a contiguous block. Acquisition of the mitigation property is subject to the approval of the City, and the developer must option or secure the property before the developer can obtain a mass grading permit.

*Water Supply Impacts*

The EIR estimates the project's water demand to be 1,290,700 gallons per day, or approximately 1,446 acre-feet per year. The project is in the service area of Padre Dam Municipal Water District (district). The district gets its water from the San Diego County Water Authority (water authority), the water authority gets most of its water from the Metropolitan Water District of Southern California (Metropolitan), and Metropolitan gets its water primarily from the State Water Project and from the Colorado River Aqueduct, which Metropolitan owns and operates.

In April 2006 the district prepared a water supply assessment and verification report (assessment) for the project.[9] Based on the project description, the district estimated the project's average annual water demands to be approximately 881 acre-feet. This is approximately 565 acre-feet less than the EIR's estimate of the project's water demands. The district's estimate is included in the district's "2001 Integrated Facilities Plan" and its "2005 Urban Water Management Plan." The district's estimate is also included in the planning documents of the district's water suppliers. The assessment concludes that if the district, the water authority, and Metropolitan implement the water development, delivery and conservation projects discussed in their planning

point out in their brief, the City requires that the two documents be consistent with each other and the draft subarea plan requires conservation and enhancement of habitat suitable for the Quino. Moreover, it is apparent from the letter the wildlife agencies' concerns related to the Quino's treatment in both documents, not just in the draft subarea plan, because the project accounts for the majority of the anticipated impacts to the Quino within the City.

[9] The EIR refers to and relies upon information in an assessment dated January 2007, but the only assessment in the record is dated April 2006.

documents, the district will have adequate water supplies to meet the district's estimate of the project's water demands during normal, single dry, and multiple dry years.

## DISCUSSION

### I

*Standard of Review*

" ' "Under CEQA, an EIR is presumed adequate (Pub. Resources Code, § 21167.3), and the plaintiff in a CEQA action has the burden of proving otherwise." ' " (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 836 [29 Cal.Rptr.2d 492].) In CEQA cases, as in other mandamus cases, "we independently review the administrative record under the same standard of review that governs the trial court." (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259 [100 Cal.Rptr.2d 301]; accord, *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).) We review an agency's determinations and decisions for abuse of discretion. An agency abuses its discretion when it fails to proceed in a manner required by law or there is not substantial evidence to support its determination or decision. (§§ 21168, 21168.5; *Vineyard, supra*, 40 Cal.4th at pp. 426–427.) "Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard*, at p. 435.)

Consequently, in reviewing an EIR for CEQA compliance, we adjust our "scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard, supra*, 40 Cal.4th at p. 435.) For example, where a petitioner claims an agency failed to include required information in its environmental analysis, our task is to determine whether the agency failed to proceed in the manner prescribed by CEQA. Conversely, where a petitioner challenges an agency's conclusion that a project's adverse environmental effects are adequately mitigated, we review the agency's conclusion for substantial evidence. (*Vineyard*, at p. 435.)

Substantial evidence for CEQA purposes is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be

reached." (Guidelines,[10] § 15384, subd. (a).) Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (*Id.*, subd. (b).) It does not include argument, speculation, unsubstantiated opinion or narrative, clearly erroneous or inaccurate evidence, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment. (*Id.*, subd. (a).)

"In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " (*Vineyard, supra,* 40 Cal.4th at p. 435; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278].) Rather, we must resolve any reasonable doubts and any conflicts in the evidence in favor of the agency's findings and decision. (*Laurel Heights,* at p. 393; *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 522–523 [129 Cal.Rptr.3d 512].)

II

*Claims Related to the Project's Biological Resources Impacts*

A

*Reliance on Draft Subarea Plan for Biological Resources Cumulative Impacts Analysis*

Plaintiffs contend the EIR's cumulative biological resources impacts analysis violates CEQA because it improperly relied on the draft subarea plan. We conclude there is no merit to this contention.

An EIR must discuss a project's cumulative impacts "when the project's incremental effect is cumulatively considerable, as defined in section 15065(a)(3)." (Guidelines, § 15130, subd. (a).) " 'Cumulatively considerable' means that the incremental effects of an individual project are significant

---

[10] All references to "Guidelines" are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.). The Guidelines are developed by the Office of Planning and Research and adopted by the Secretary of the Resources Agency. (§ 21083; *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 465, fn. 4 [134 Cal.Rptr.3d 194].) "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard, supra,* 40 Cal.4th at p. 428, fn. 5.)

when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (*Id.*, § 15065, subd. (a)(3); see § 21083, subd. (b)(2).) "A project's contribution is less than cumulatively considerable if the project is required to implement or fund its fair share of a mitigation measure or measures designed to alleviate the cumulative impact." (Guidelines, § 15130, subd. (a)(3).)

The adequacy of an EIR's discussion of a project's cumulative impacts is determined by standards of practicality and reasonableness. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 525 [80 Cal.Rptr.3d 28, 187 P.3d 888]; Guidelines, § 15130, subd. (b).) The discussion must reflect the severity of the impacts and the likelihood of their occurrence, but need not contain the same degree of detail as the EIR's discussion of impacts attributable to the project alone. (Guidelines, § 15130, subd. (b).) The discussion may also rely upon previously approved land use documents, including general plans, specific plans, and local coastal plans. (§ 21100, subd. (e); see Guidelines, § 15130, subd. (d).)

In this case, the EIR concluded the project's cumulative impacts on biological resources were not cumulatively considerable, except as to impacts on the grasshopper sparrow, which we discuss in more detail *post*. In reaching this conclusion, the EIR first discussed the development potential of the property surrounding the project. The only possible or anticipated development whose effects when combined with the project's effects might result in cumulatively considerable impacts was in the City of San Diego and the County of San Diego. Development in both jurisdictions is covered by the MSCP and by the jurisdictions' respective subarea plans. By assuming both jurisdictions would ensure subsequent development within their boundaries was consistent with the MSCP and their respective subarea plans, the EIR was relying on approved land use plans, which CEQA expressly permits. (§ 21100, subd. (e); see Guidelines, § 15130, subd. (d).)

The EIR's assumption that the City would also ensure subsequent development within its boundaries was consistent with either the draft subarea plan, if approved, or the MSCP requirements, if the draft subarea plan is not approved, similarly reflects permissible reliance on the MSCP. It also reflects a permissible recognition that "[a] project's contribution is less than cumulatively considerable if the project is required to implement . . . its fair share of a mitigation measure or measures designed to alleviate the cumulative impact." (Guidelines, § 15130, subd. (a)(3).)

The biological resources technical report supports this interpretation of the EIR's cumulative impacts analysis. The report indicates the proposed development of the surrounding property was in the early planning stages and,

consequently, the proposed development's impacts on biological resources were not known. Nonetheless, the report concluded the project would not result in cumulatively considerable impacts to biological resources because both the potential development and the project are subject to the MSCP, the project meets or exceeds the MSCP requirements, the project does not interfere with the potential development's compliance with the MSCP requirements, and the project's own impacts to biological resources will be mitigated to below a level of significance.

■ Although plaintiffs adamantly dispute the EIR is relying on the MSCP rather than the draft subarea plan, plaintiffs contend even reliance on the MSCP was improper because the MSCP does not cover all of the biological resources the project may cumulatively impact. Assuming, without deciding, this argument is properly before us, it is unavailing. The purpose of a cumulative impacts analysis is to assess whether the incremental effects of a project *combined with the effects of other development* would cause a significant environmental impact. When the City certified the EIR, the other potential development surrounding the project was in the early planning stages and the potential development's effects on biological resources were not known. Thus, irrespective of coverage under the MSCP or a subarea plan, there was insufficient information to permit a species-specific analysis of the project's cumulative biological resources impacts. Nonetheless, by explaining the project and the potential development must comply with the same conservation goals, the project will not interfere with the potential development's attainment of its share of the goals, the project has exceeded its share of the goals, and the project mitigated its impacts to a level below significant, the EIR's analysis was adequate under a practical and reasonable standard.

The EIR's discussion of cumulative impacts on the grasshopper sparrow does not alter our conclusion. The EIR explained that the grasshopper sparrow's habitat is annual grassland. It further explained that although more than 50 percent of the onsite annual grassland habitat will be conserved as open space, the project will reduce or eliminate wildfires. The reduction or elimination of wildfires could cause the annual grassland habitat to permanently convert to scrub habitat and contribute to a significant cumulative impact to the grasshopper sparrow.[11] To mitigate this impact, the developer is required to conserve other annual grassland habitat at a one-to-one ratio.

While characterized as a cumulative impact, this particular effect of the project actually appears to be a long-term indirect impact. The effect's analysis was presumably prompted by, or at least related to, the City's decision not to adopt the open space fuel modification provisions of the fire

---

[11] At the time the City certified the EIR, federal and state agencies did not consider the grasshopper sparrow to be a sensitive species, but local conservation groups did.

plan. Regardless of the effect's characterization or its genesis, the EIR's discussion of it demonstrates an effort to provide necessary information rather than the converse.

More importantly, the discussion of this effect does not undermine the rationale for the EIR's conclusion the project's biological impacts are not cumulatively considerable—the biological impacts of the potential development of the surrounding property were not known, but both the potential development and the project are subject to the MSCP, the project meets or exceeds the MSCP requirements and does not interfere with the potential development's compliance with the MSCP requirements, and the project's own impacts will be mitigated to below a level of significance. Accordingly, plaintiffs have not established the City improperly relied on the draft subarea plan to avoid analyzing the project's cumulative biological impacts, or that the EIR's analysis of the project's cumulative biological resources impacts is otherwise inadequate.

B

*Feasibility of Acquisition of Offsite Mitigation Property*

Plaintiffs contend the mitigation measure requiring the developer to acquire offsite mitigation property violates CEQA because the record does not show acquisition of such property is feasible. We conclude there is no merit to this contention either.

"A mitigation measure is feasible if it is 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' " (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 622 [91 Cal.Rptr.3d 571], quoting § 21061.1.) Generally, an agency does not need to identify the exact location of offsite mitigation property for an EIR to comply with CEQA. (*California Native Plant Society*, at pp. 621–622.)

Moreover, contrary to plaintiffs' assertion, there is substantial evidence in the record to show acquisition of the mitigation property is capable of being successfully accomplished within a reasonable time period. Regarding the offsite property to be acquired in the north Magnolia Summit subunit, the record indicates the developer had identified approximately 88 acres of suitable property at the time the City certified the EIR. The record also indicates the developer was actively negotiating with property owners in the area and was confident it could acquire all the necessary acreage. Regarding the offsite Quino mitigation property, the record indicates the developer

searched for suitable property based on availability, proximity to Santee, presence of the Quino or the high potential to support the Quino, and property size, and found many potential sites meeting the search criteria. Although the developer acknowledged it may not be able to find one contiguous block of Quino mitigation property within the time period desired by the wildlife agencies, this does not render the mitigation measure infeasible because the EIR does not require the acquisition of one contiguous block of property if such an acquisition is not possible.

The evidence plaintiffs rely upon to support their position is unpersuasive as the evidence involves communications significantly predating the formulation of the mitigation measure and discussing requirements not incorporated into it. Accordingly, plaintiffs have not met their burden of demonstrating the mitigation measure failed to comply with CEQA.

## C

### *Deferred Mitigation of Quino Impacts*

Plaintiffs contend the EIR provision providing for the postapproval formulation of the habitat plan's provisions for active management of the Quino within the preserve violates CEQA's proscription against deferred mitigation measures. We agree.

■ An EIR must describe feasible measures that could minimize significant adverse impacts. (Guidelines, § 15126.4, subd. (a)(1).) An EIR may not defer the formulation of mitigation measures to a future time, but mitigation measures may specify performance standards which would mitigate the project's significant effects and may be accomplished in more than one specified way. (*Id.*, subd. (a)(1)(B).)

Thus, " ' "for [the] kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated." ' " (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275–1276 [15 Cal.Rptr.3d 176].) Conversely, " '[i]mpermissible deferral of mitigation measures occurs when an EIR puts off analysis or orders a report without either setting standards or demonstrating how the impact can be

mitigated in the manner described in the EIR.' " (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 236 [128 Cal.Rptr.3d 733].)

In this case, while the EIR contains measures to mitigate the loss of Quino habitat, the EIR does not describe the actions anticipated for active management of the Quino within the preserve. The EIR also does not specify performance standards or provide other guidelines for the active management requirement. The developer's reliance on the contents of the draft habitat plan to fill this gap is unavailing because the requirement for the Quino management section arose at the wildlife agencies' request *after* preparation of the draft habitat plan, indicating the draft habitat plan's discussion of Quino management activities was inadequate on this point.

The absence of standards or guidelines in the EIR for active management of the Quino within the preserve is problematic because the draft habitat plan indicates vegetation management is the key consideration for the Quino's conservation and the City will not be utilizing prescribed burns or grazing in the preserve, the only two methods of vegetation management the draft habitat plan identifies. In addition, the timing and specific details for implementing other Quino management activities discussed in the draft habitat plan are subject to the discretion of the preserve manager based on prevailing environmental conditions. Consequently, these activities are not guaranteed to occur at any particular time or in any particular manner.

█ It, therefore, appears the success or failure of mitigating the project's impacts to the Quino largely depends on what actions the approved habitat plan will require to actively manage the Quino within the preserve. "An EIR is inadequate if '[t]he success or failure of mitigation efforts . . . may largely depend upon management plans that have not yet been formulated, and have not been subject to analysis and review within the EIR.' " (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 92 [108 Cal.Rptr.3d 478], quoting *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 670 [57 Cal.Rptr.3d 663].)

Moreover, the EIR does not state, nor is it readily apparent, why specifying performance standards or providing guidelines for the active management of the Quino within the preserve was impractical or infeasible at the time the EIR was certified. The fact that the City and wildlife agencies must ultimately approve the habitat plan does not cure these informational defects. (*San Joaquin Raptor Rescue Center v. County of Merced, supra,* 149 Cal.App.4th at p. 670.) Accordingly, we conclude the City violated CEQA by improperly deferring formulation of this mitigation measure.

The recently published decision in *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899 [146 Cal.Rptr.3d 12] to which the

City and developer called our attention is factually inapposite. The mitigation measures discussed in the decision articulated specific performance criteria (e.g., 80 percent of any transplanted special status plant species must be established within three years). In addition, the potential wildlife agency approvals contemplated by the mitigation measures involved formal consultations and permitting. (*Id.* at pp. 941–943.) Thus, unlike here, the mitigation measures were sufficiently definite to support a finding the project's impacts to certain biological resources would be reduced to below significant.

### III

*Claims Related to the Project's Water Supply Impacts*

Plaintiffs contend the City's analysis of the project's water supply impacts violates CEQA because there is insufficient evidence an adequate long-term water supply exists for the project. More particularly, plaintiffs contend the district's assessment, upon which the EIR relies, does not provide firm assurance of adequate water supplies for the project because (1) the assessment's estimation of the project's water demands differs appreciably from the EIR's estimation of the project's water demands; and (2) the assessment assumes that the district will receive a full supply of imported water during both wet and dry years and that water rationing will occur and will result in reduced water demand during single dry years. Plaintiffs additionally contend the EIR fails to address the unreliability of imported water sources due to drought, environmental constraints, and the contingent nature of future water development and infrastructure improvement projects. Plaintiffs also contend the EIR fails to analyze the environmental consequences of using alternative sources of water to fill and recharge the 10-acre lake portion of the project should the district decline to provide potable water for it. We agree with each of these points.

### A

■ Water Code sections 10910 to 10912 "require the city or county considering a project to obtain, at the outset of the CEQA process, a water supply 'assessment' from the applicable public water system. [Citation.] The 'water supply assessment' is then to be included in any CEQA document the city or county prepares for the project. [Citation.] With regard to *existing* supply entitlements and rights, a water supply assessment must include assurances such as written contracts, capital outlay programs and regulatory approvals for facilities construction . . . , but as to additional *future* supplies needed to serve the project, the assessment need include only the public water system's plans for acquiring the additional supplies, including cost and time estimates and regulatory approvals the system anticipates needing." (*Vineyard,*

*supra*, 40 Cal.4th at p. 433, fn. omitted.) CEQA correspondingly requires compliance with these Water Code provisions. (§ 21151.9; *Vineyard*, at p. 433, fn. 8.)

■ Similarly, before a city approves a residential development of more than 500 units, Government Code section 66473.7, which is part of the Subdivision Map Act (Gov. Code, § 66410 et seq.), requires the city "to obtain from the applicable public water system a 'written verification' that adequate water supplies will be available for that project as well as other existing and planned future uses for a projected 20-year period. When the verification rests on supplies not yet available to the water provider, it is to be based on firm indications the water will be available in the future, including written contracts for water rights, approved financing programs for delivery facilities, and the regulatory approvals required to construct infrastructure and deliver the water. [Citation.] The subdivision map may be approved only if the water system verifies, or the city or county finds on substantial evidence, that water supplies will be adequate." (*Vineyard, supra*, 40 Cal.4th at p. 433.)

■ Collectively, Water Code sections 10910 to 10912 and Government Code section 66473.7 require that water supplies be identified with more specificity as land use and water supply planning progresses from general to more specific phases. (*Vineyard, supra*, 40 Cal.4th at pp. 433–434.) By the subdivision map approval stage, which was the project's stage (see fn. 2, *ante*), the Water Code's requirement for plans and estimates of future water supplies is replaced by the Government Code's requirement for firm assurances of future water supplies. (*Vineyard*, at p. 434.)

Nonetheless, the ultimate question under CEQA is whether the EIR adequately addresses the reasonably foreseeable impacts of supplying water to the project, not whether the EIR establishes a likely source of water. Thus, "[i]f the uncertainties inherent in long-term land use and water planning make it impossible to confidently identify the future water sources, an EIR may satisfy CEQA if it acknowledges the degree of uncertainty involved, discusses the reasonably foreseeable alternatives—including alternative water sources and the option of curtailing the development if sufficient water is not available for later phases—and discloses the significant foreseeable environmental effects of each alternative, as well as mitigation measures to minimize each adverse impact." (*Vineyard, supra*, 40 Cal.4th at p. 434.)

## B

■ Applying these standards, we conclude the EIR does not adequately analyze the project's water supply impacts. Of most obvious concern is the large discrepancy between the EIR's estimation of the project's water demands and the assessment's estimation of the project's water demands. This

discrepancy is not explained in the EIR and such an unexplained discrepancy precludes the existence of substantial evidence to conclude sufficient water is likely to be available for the project. (*Vineyard, supra*, 40 Cal.4th at p. 439.) The developer and the City argue the discrepancy exists because the EIR's estimates are based on more general categorical water demands and the assessment's estimates are based on more precise project specific water demands. While this may, in fact, explain the discrepancy, we have no basis for assuming the assessment's estimation of the project's water demands is more accurate than the EIR's estimation.[12] Additionally, "[t]he audience to whom an EIR must communicate is not the reviewing court but the public and the government officials deciding on the project. That a party's briefs to the court may explain or supplement matters that are obscure or incomplete in the EIR, for example, is irrelevant because the public and decision makers did not have the briefs available at the time the project was reviewed and approved. The question is therefore not whether the project's significant environmental effects *can* be clearly explained, but whether they were." (*Id.* at p. 443.) In this case, the project's water supply impacts were not adequately explained, as the EIR's conclusion that the project will have less than significant impacts depends on the assessment and, because of the discrepancy, the assessment only addresses about 61 percent of the water demands estimated in the EIR.

## C

Also of concern is the contingent nature of the district's water supply projections. As the district explained in an October 2007 addendum to the assessment, because it receives all of its water from the water authority, the assessment's conclusions depend entirely on the water authority's and Metropolitan's water supply projections and reliability plans. In turn, Metropolitan's water supply projections and reliability plan, and by implication the water authority's, depend heavily upon the reliability of the water Metropolitan receives from the State Water Project. However, an August 2007 court decision created at least short-term uncertainty in Metropolitan's receipt of water from the State Water Project, and the district acknowledged in its

---

[12] At the public hearing on the project, the mayor, in an exchange with a district representative, estimated the project's annual water demand to be 900 acre-feet. The district representative did not dispute or confirm this estimate. Moreover, the mayor initiated the exchange because he wanted to determine for himself roughly what percentage of the district's total annual water supply the project would use. He was not trying to clarify the discrepancy between the EIR's estimate and the assessment's estimate of the project's water demands. To the contrary, there is no indication he or any of the other decision makers knew of the discrepancy. Thus, contrary to the City and developer's assertion, this exchange provides no basis for concluding the assessment's estimate is the more accurate one.

October 2007 addendum that it could not "predict whether any mandatory cut backs will result from the court's ruling or what the impact of those cut backs would be."

 The EIR does not discuss this uncertainty[13] or any of the known contingencies to a reliable water supply, including the successful implementation of planned water development, water delivery, and water conservation projects. To provide decision makers with sufficient facts to evaluate the pros and cons of fulfilling the project's water needs, the EIR must "address the impacts of *likely* future water sources," including providing "a reasoned analysis of the circumstances affecting the likelihood of the water's availability." (*Vineyard, supra*, 40 Cal.4th at p. 432.) Where it is impossible to confidently determine the availability of anticipated future water sources, the EIR must discuss "possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies." (*Ibid.*) As the EIR in this case failed to include such a discussion in its analysis of the project's water supply impacts, it failed to meet CEQA's requirements.

### D

Of further concern is the dearth of information and analysis in the EIR regarding the water demands for the 10-acre lake portion of the project. The lake is intended to serve a storm water treatment function. The City's general plan requires, and the EIR anticipated, potable water would be used to fill the lake. The EIR also anticipated potable water would be used to recharge the lake when there was insufficient storm water runoff to do so. The EIR identified groundwater as the anticipated source of potable water to recharge the lake, but does not specifically identify a source of potable water to fill the lake. Although the record alludes to the use of groundwater for both purposes, the record does not support a conclusion there is sufficient groundwater for either purpose.

---

[13] Although the EIR does not discuss this uncertainty, the City discussed it in its "CEQA Findings and Facts in Support of Findings" (findings) for the project. The findings state this type of supply uncertainty is addressed in the assessment as well as the district's, the water authority's, and Metropolitan's urban water management plans, and the plans demonstrate that there is a sufficient water supply for the project even with this type of supply uncertainty. However, as all of these documents predate the trial court's decision, they could not have specifically addressed the decision. Moreover, Metropolitan's urban water management plan expressly states it will only meet its water supply reliability goals if it receives average annual water deliveries of 1.5 million acre-feet from the State Water Project, it increases its yield from the State Water Project in critically dry years to 650,000 acre-feet, and it has access to its full contracted amount of water from the State Water Project during wet years to replenish surface and groundwater storage. As the trial court's decision undermined each of these assumptions, there was an insufficient factual basis for the City's finding that the trial court's decision would not affect the availability of sufficient water to meet the project's demands.

According to the EIR, if the extraction of groundwater lowers the water table by more than a meter, it could have a significant adverse impact on riparian areas. Consequently, the developer must monitor the groundwater level and must stop using groundwater if the water table level drops more than one meter, unless hydrology and biology experts determine that using additional groundwater will not have adverse biological impacts. If the developer cannot use groundwater, the developer must find some other source of potable water.

■ The need to find some other source of potable water is not implausible, as an August 2007 evaluation of the potential impacts of groundwater development and pumping for the project indicates it will be difficult to develop long-term, sustainable yields of groundwater at the project site. The district is the only other source of potable water discussed in the EIR, and the City and developer acknowledge in their brief that the assessment does not account for any water demands associated with filling and recharging the lake. An EIR may not ignore or assume a solution to the problem of supplying water to a proposed project. (*Vineyard, supra,* 40 Cal.4th at p. 431.) The EIR in this case has done exactly that by failing to analyze the impacts of obtaining potable water to fill and recharge the lake if there is insufficient groundwater for this purpose. Thus, it fails to satisfy CEQA's requirements.

IV

*Propriety of Limited Writ Remedy*

Plaintiffs contend the trial court's use of a limited writ to remedy the City's CEQA violations was improper. More particularly, they contend that, whenever a trial court finds an EIR inadequate, the trial court must decertify the EIR and vacate all related project approvals. We disagree.

A

■ The remedies for an agency's failure to comply with CEQA are governed by section 21168.9. Under this section, when a court finds an agency's determination, finding, or decision does not comply with CEQA, the court must enter an order, in the form of a peremptory writ of mandate, containing one or more of three specified mandates. (§ 21168.9, subds. (a) & (b).) The first mandate is that the agency void the determination, finding, or decision in whole or in part. (*Id.,* subd. (a)(1).) The second mandate is that the agency suspend specific project activities related to the determination, finding, or decision that could adversely affect the physical environment until the agency takes the action necessary for the determination, finding, or

decision to comply with CEQA. This mandate applies only if the trial court finds the specific project activities will prejudice consideration or implementation of particular mitigation measures or project alternatives. (§ 21168.9, subd. (a)(2).) The final mandate is that the agency take the specific action necessary for the determination, finding, or decision to comply with CEQA. (§ 21168.9, subd. (a)(3).)

In deciding which mandates to include in its order, a trial court relies on equitable principles. (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (2001) 89 Cal.App.4th 1097, 1104 [109 Cal.Rptr.2d 108] (*San Bernardino Audubon*).) However, the trial court may not direct the agency to exercise its discretion in a particular way and may only include the mandates necessary to achieve compliance with CEQA. (§ 21168.9, subds. (b) & (c).) In addition, the trial court's order must be limited to the portion of a determination, finding, or decision, or the specific project activities that do not comply with CEQA if the trial court finds that (1) the portion or specific project activities are severable, (2) severance will not prejudice complete and full compliance with CEQA, and (3) the trial court has not found the remainder of the project to be in noncompliance with CEQA. (§ 21168.9, subd. (b).)

B

Plaintiffs' challenge to the limited writ remedy raises two interrelated questions: whether the trial court properly interpreted section 21168.9 as authorizing the limited writ remedy and whether the trial court properly exercised its equitable powers in utilizing the remedy in this case. We review the trial court's interpretation of section 21168.9 de novo. We review the trial court's exercise of its equitable powers for abuse of discretion. (*Ho v. Hsieh* (2010) 181 Cal.App.4th 337, 344–345 [105 Cal.Rptr.3d 17].)

1

"When construing a statute, a court's goal is 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citations.] Generally, the court first examines the statute's words, giving them their ordinary and usual meaning and viewing them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent. [Citations.] [¶] When the statutory language is ambiguous, a court may consider the consequences of each possible construction and will reasonably infer that the enacting legislative body intended an interpretation producing practical and workable results rather than one producing mischief or absurdity. 'Our decisions have long recognized that a court's "overriding purpose" in construing a statute is

"to give the statute a *reasonable* construction conforming to [the Legislature's] intent [citation] . . . ." ' [Citation.] 'The court will apply common sense to the language at hand and interpret the statute to make it workable and reasonable.' [Citation.] 'When a statute is capable of more than one construction, " '[w]e must . . . give the provision a reasonable and common-sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity.' " ' " (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567 [67 Cal.Rptr.3d 468, 169 P.3d 889].)

2

■ "Section 21168.9 was enacted in 1984 to give the trial courts some flexibility in tailoring a remedy to fit a specific CEQA violation." (*San Bernardino Audubon, supra*, 89 Cal.App.4th at p. 1103.) The Legislature amended section 21168.9 in 1993 to expand "the trial court's authority and 'expressly authorized the court to fashion a remedy that permits some part of the project to go forward while an agency seeks to remedy its CEQA violations. In other words, the issuance of a writ need not always halt all work on a project.' " (*San Bernardino Audubon*, at pp. 1104–1105.) Thus, "[i]f a court finds . . . any *determination, finding, or decision* of a public agency" violates CEQA, section 21168.9 permits the court to mandate "that the *determination, finding, or decision* be voided by the public agency, *in whole or in part.*" (§ 21168.9, subd. (a)(1), italics added.)

■ In our view, a reasonable, commonsense reading of section 21168.9 plainly forecloses plaintiffs' assertion that a trial court must mandate a public agency decertify the EIR and void all related project approvals in every instance where the court finds an EIR violates CEQA. Such a rigid requirement directly conflicts with the "in part" language in section 21168.9, subdivision (a)(1), which specifically allows a court to direct its mandates to parts of determinations, parts of findings, or parts of decisions. Such a rigid requirement also conflicts with the language in section 21168.9, subdivision (b), limiting the court's mandates to only those necessary to achieve CEQA compliance and, if the court makes specified findings, to only "that *portion* of a determination, finding, or decision" violating CEQA. (Italics added.)

Further, such a rigid requirement is not always necessary to ensure a public agency or a developer does not thwart or render CEQA compliance meaningless by proceeding with environmentally harmful project activities before the public agency corrects its CEQA violations. Section 21168.9 provides the court with other means of ensuring this does not occur, as it expressly allows

a court to mandate the suspension of any project activities that might adversely affect the environment and prejudice the consideration or implementation of mitigation measures or project alternatives until the public agency complies with CEQA. (§ 21168.9, subd. (a)(2).) Accordingly, we conclude the trial court correctly determined it had the authority under section 21168.9 to issue a limited writ.

 *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184 [22 Cal.Rptr.3d 203] (*Bakersfield Citizens*) and *LandValue 77, LLC v. Board of Trustees of California State University* (2011) 193 Cal.App.4th 675 [122 Cal.Rptr.3d 37] (*LandValue*), upon which plaintiffs rely, do not alter our conclusion. The appellate court in the *Bakersfield Citizens* case did not apply, or even discuss, section 21168.9. (*Bakersfield Citizens*, at pp. 1220–1221.) While the appellate court in *LandValue* discussed subdivision (b) of section 21168.9, the court's only reference to subdivision (a) of section 21168.9 was to perfunctorily conclude the "in part" language in subdivision (a)(1) did not apply to EIR certification decisions. (*LandValue*, at pp. 681–682.) In reaching this conclusion, the court relied heavily on a treatise that also does not discuss the "in part" language in section 21168.9 subdivision (a)(1). (*LandValue*, at pp. 681–682, quoting 2 Robie et al., Cal. Civil Practice: Environmental Litigation (2010) § 8:33, p. 61.) In fact, the treatise's restatement of section 21168.9 subdivision (a)(1), omits the "in part" language, making it unclear whether the treatise's authors were even aware of the language. (2 Robie et al., Cal. Civil Practice: Environmental Litigation, *supra*, § 8:33, p. 60.) As opinions are not authority for propositions not considered (*People v. Knoller* (2007) 41 Cal.4th 139, 154–155 [59 Cal.Rptr.3d 157, 158 P.3d 731]), neither *Bakersfield Citizens* nor *LandValue* is apposite here.

## C

Having concluded a trial court has the authority under section 21168.9 to issue a limited writ in appropriate cases, the question remains whether the trial court abused its discretion in doing so here. " 'An abuse of discretion occurs when, in light of applicable law and considering all relevant circumstances, the court's ruling exceeds the bounds of reason.' " (*Ho v. Hsieh, supra*, 181 Cal.App.4th at p. 345.)

The trial court in this case opted for the limited writ remedy, believing that the EIR's flawed fire safety analysis was the sole CEQA violation and that the project's fire safety impacts were discrete. We have since identified additional CEQA violations in the EIR's handling of the project's biological resources and water supply impacts. Moreover, during our review of plaintiffs' biological resources claims, we observed a strong interrelationship

between the project's fire safety impacts and its biological resources impacts because the preservation of some sensitive species, including the Quino and the grasshopper sparrow, requires careful vegetation management through fire, grazing, or other means. Consequently, whatever steps the City takes to remedy the EIR's deficiencies in one of these areas could affect the steps the City takes to remedy the EIR's deficiencies in the other. Thus, we question whether the issuance of a limited writ was reasonable in this case. We need not decide the matter, however, because the trial court recently ordered the City to decertify the EIR and set aside the project approvals as part of subsequent trial court proceedings (see fn. 5, *ante*).

## V

### *Award of Attorney Fees and Costs*

After the trial court issued the limited writ, plaintiffs filed a cost memorandum. The City and the developer filed a motion to strike or, alternatively, to tax costs. The trial court denied the motion to strike and awarded plaintiffs costs, finding plaintiffs were the prevailing parties because they "obtained relief against [the City] with respect to the fire protection plan," which "had a significant impact on the project as a whole."

Plaintiffs then moved for prejudgment and postjudgment attorney fees under Code of Civil Procedure section 1021.5. The trial court denied the motion for prejudgment attorney fees as untimely, but awarded postjudgment attorney fees of $45,555.50, finding the statutory requirements for such a fee award had been met.

The City and the developer contend we must reverse the cost award because the trial court erroneously determined plaintiffs were the prevailing parties. They contend we must reverse the attorney fee award for the same reason and also because the plaintiffs did not achieve a significant benefit from the litigation. They alternatively contend we must reverse the fee award because the trial court's ruling did not explain the basis for the fee award amount, except to state the amount did not include fees related to subsequent litigation between the parties. We conclude there is no merit to these contentions.

## A

Regarding the latter contention, the trial court was not required to provide a detailed explanation of how it arrived at the fee award amount absent a request for a statement of decision. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140–1141 [104 Cal.Rptr.2d 377, 17 P.3d 735]; *Mann v. Quality*

*Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 342, fn. 6 [42 Cal.Rptr.3d 607]; *Rebney v. Wells Fargo Bank* (1991) 232 Cal.App.3d 1344, 1349 [284 Cal.Rptr. 113].) As the City and the developer have not established they requested and were improperly denied a statement of decision, they have not established we must reverse the fee award on this ground.

## B

 Regarding plaintiffs' entitlement to costs and attorney fees, a prevailing party in an action or proceeding is generally entitled to recover its costs as a matter of right. (Code Civ. Proc., § 1032, subd. (b).) In cases, such as this one, where the recovery is other than monetary relief, the trial court determines the prevailing party and may in its discretion award the party costs. (*Id.*, subd. (a)(4).) In addition, Code of Civil Procedure "[s]ection 1021.5 authorizes an award of fees when (1) the action 'has resulted in the enforcement of an important right affecting the public interest,' (2) 'a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons . . . ,' and (3) 'the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . .' " (*Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1026 [132 Cal.Rptr.3d 358, 262 P.3d 568].)

Given our conclusion in this appeal that there were additional CEQA violations, plaintiffs are unquestionably the successful parties in this litigation. Not only did they identify a significant flaw in the City's analysis of the project's fire safety impacts, but they also identified significant flaws in the City's analysis of the project's water supply impacts and mitigation of the project's Quino impacts. At least two of these flaws—the inadequate analysis of the project's fire safety impacts and the inadequate analysis of the project's water supply impacts—apply to the entire project and, consequently, warrant precluding any part of the project from proceeding until they are corrected. Further, the identification of these flaws and the corresponding need to correct them will compel the City to reconsider what it must do to comply with CEQA and, therefore, both results in the enforcement of important public interest laws and confers a significant benefit on the general public. (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 892–893, 895 [111 Cal.Rptr.3d 374] [litigation to enforce CEQA involves important rights affecting the public interest and more indepth CEQA review confers a significant public benefit].) Finally, there is no evidence plaintiffs or its members have any financial interest in the outcome of this litigation and, as the enormous record, extensive briefing, and lengthy litigation path of this case amply demonstrate, the necessity and financial burden of private enforcement are such to make an attorney fee award appropriate. Accordingly, we conclude the trial court properly awarded plaintiffs costs and attorney fees

in this matter. As plaintiffs are also entitled to an award of costs and attorney fees for their successful appeal efforts, we remand the matter to the trial court for further proceedings to determine the award amount.

## DISPOSITION

The judgment is reversed as to plaintiffs' claims that the EIR violates CEQA by improperly deferring mitigation of the project's impacts to the Quino and inadequately analyzing the project's water supply impacts. The judgment is affirmed in all other respects. Parties Preserve Wild Santee, Center for Biological Diversity, and Endangered Habitats League, Inc., are awarded costs and attorney fees on appeal. The matter is remanded to the trial court to determine the amount of appellate attorney fees and costs and for further proceedings consistent with this decision.

Haller, J., and Aaron, J., concurred.