[No. A135593. First Dist., Div. Five. Apr. 12, 2013.]

GOLDEN GATE LAND HOLDINGS LLC, Plaintiff and Appellant, v. EAST BAY REGIONAL PARK DISTRICT, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.D.

## COUNSEL

Briscoe Ivester & Bazel, John Briscoe, David M. Ivester and William B. Most for Plaintiff and Appellant.

Price, Postel & Parma and Todd A. Amspoker for Defendant and Respondent.

## OPINION

**BRUINIERS, J.**—Appellant Golden Gate Land Holdings LLC (Golden Gate) owns 140 acres of land straddling the border of Albany and Berkeley, on the east shore of San Francisco Bay. The site includes the Golden Gate Fields racetrack. The East Bay Regional Park District (the District) approved a resolution of necessity to condemn eight shoreline acres of Golden Gate's property to help complete the Eastshore State Park (Eastshore Park), and to construct a segment of the San Francisco Bay Trail (the Bay Trail). The District concluded that the project was exempt from the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] and posted a notice of exemption. Golden Gate petitioned the superior court for a writ of mandate seeking to vacate the District's resolution of necessity, arguing that CEQA required preparation of an environmental impact report (EIR) and that the District had violated eminent domain law.

---

[1] All further section references are to the Public Resources Code unless otherwise indicated.

The trial court granted the petition, but declined to direct the District to set aside its approval of the resolution of necessity. The court instead ordered the District to vacate only its CEQA exemption finding, permitting the District to leave its resolution of necessity intact and proceed with its condemnation action. Golden Gate appeals, arguing that the remedy granted by the trial court improperly allows the District to conduct after-the-fact environmental review of an already approved project. In the published portion of this opinion we address the CEQA issues, and we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The District is a regional park district formed and existing pursuant to section 5500 et seq. It is charged with developing and operating public parks in Alameda and Contra Costa Counties. (See § 5541.)[2] It also has the authority to develop recreational trails and acquire land for such purposes. (§ 5541.1.)[3] The District is empowered to exercise the right of eminent domain "to take any property necessary or convenient to accomplish [such] purposes." (§ 5542; see § 5540.)

In 1992, the Legislature enacted section 5003.03, which provides, in relevant part: "(a) It is the intent of the Legislature, in enacting this section, to provide for the acquisition, planning, and operation of a state park project located on the east shore of the San Francisco Bay. *The state park project shall consist of a contiguous shoreline park and bay trail along the east shore of the San Francisco Bay from the Bay Bridge to the Marina Bay Trail* in Richmond, serving as a recreational facility within its natural setting developed in concert with a public planning process agreeable to the state and [the District]. [¶] . . . [¶] (c) For the purpose of the acquisition, planning, and development of the shoreline park, the district shall act as agent for the state and, as the state's agent, shall have the authority to exercise all of the district's powers for the purposes of acquiring, planning, and developing the shoreline park. The district shall be reimbursed by the state for any direct

---

[2] Section 5541 provides, in relevant part: "A district may plan, adopt, lay out, plant, develop, and otherwise improve, extend, control, operate, and maintain a system of public parks, playgrounds, golf courses, beaches, trails, natural areas, ecological and open space preserves, parkways, scenic drives, boulevards, and other facilities for public recreation, for the use and enjoyment of all the inhabitants of the district, and it may select, designate, and acquire land, or rights in land, within or without the district, to be used and appropriated for such purposes."

[3] Section 5541.1 provides, in relevant part: "[The District] may plan, adopt, lay out, plant, develop, and otherwise improve, extend, control, operate, and maintain vehicular recreational areas and trails for the use and enjoyment of all the inhabitants of the district, and it may select, designate, and acquire land, or rights in land, within or without the district, to be used and appropriated for such purposes. [The District] may cause such vehicular recreational areas and trails to be opened, altered, widened, extended, graded or regraded, paved or repaved, planted or replanted, repaired, and otherwise improved."

costs that the district incurs in carrying out these activities, upon appropriation therefor by the Legislature. By appointing the district as agent for the state, it is the intent of the Legislature to direct the state and the district *to act in an expeditious manner* towards the acquisition, planning, and development of the shoreline park." (Italics added.)

The Bay Trail is part of this effort. It is a planned 400-mile recreational corridor intended to ultimately encircle the San Francisco and San Pablo Bays, linking nine counties and 47 cities, and providing a continuous network of bicycling and hiking trails along the shoreline. The District has long planned to extend the more than 270 miles of trail already completed. The District is also working to fully establish and develop the Eastshore Park. To that end, the state and the District cooperated in preparing the "Eastshore State Park General Plan." Acting as an agent for the state, the District has acquired and operates lands to the south and north of Golden Gate Fields. Eastshore Park currently consists of open space, walking paths, and pedestrian and bicycle trails (including the Bay Trail).

In 2003, the prior owner of Golden Gate Fields entered into a license agreement with the District allowing the public to use the property for recreational purposes. The license has since expired and has not been extended. Since then, Golden Gate has informally allowed the general public to use its property to bridge the existing gap in the Bay Trail. However, the public is exposed to dangerous traffic conditions in the Golden Gate Fields customer parking lot, and along the main access road to the racetrack.

In 2006, in connection with the District's attempt to negotiate a voluntary acquisition of a portion of Golden Gate's property, the District contracted with Questa Engineering Corporation to prepare engineering plans and assist with preconstruction work. The concept plans, which were initially completed in 2006 and revised in 2007 and 2008, set forth three alternatives. The District obtained a cost estimate for its preferred trail design, which included demolition, installation of new retaining walls and fences, excavation, pavement restoration, installation of new pavement, and drainage improvements. However, Golden Gate refused to enter into a long-term license agreement.

In 2009, with no voluntary acquisition feasible, the District began preparing legal descriptions and plat maps for appraisal and potential condemnation proceedings. The District offered Golden Gate approximately $1,686,000 to acquire the property rights.

After the offer was not accepted, the District's board of directors (Board) noticed a public hearing, for April 5, 2011, to consider a resolution of

necessity to authorize eminent domain proceedings.[4] At the Board meeting, assistant district manager Nancy Wenninger explained: "So, we spent quite a bit of time with engineers looking at how we could make [the Bay Trail] safe, how we could avoid conflicts with the racetrack. Everything we looked at, at first, involved the racetrack losing a lane for their traffic. And that was not just workable for them. So, we finally settled upon this latest strategy, which is to keep the trail outboard and run it along the shoreline all the way . . . . [¶] . . . [¶] . . . We believe it is the best alignment for us to have. . . . And so, in order to be able to spend money to construct a . . . trail, we need land tenure. . . . [¶] . . . [¶] The design, which is still preliminary, basically, puts the trail outboard of the existing road. So it would be along the shoreline, between the shoreline and the road. It would not follow that old road which currently exists. It will require some reconfiguration of the entry into the Golden Gate Fields property. They will put the trail on the outside, so there will be no point in time at which trail users have to cross through the racetrack [traffic], all along the shoreline all the way. This will be a typical Class I trail, 12 feet wide and at least two-foot shoulders on each side."

The District's staff also issued a report that states: "The District commissioned a feasibility study to determine the best alignment for the Bay Trail segment. A number of alternatives were considered. The alignment selected is physically separated from the racetrack traffic and will provide the safest, most scenic trail experience. It has also been designed with a grade which complies with the Americans with Disabilities Act." The report also states: "The proposed project is exempt from [CEQA] pursuant to CEQA Guidelines, Section 15325."[5]

---

[4] Both a precondemnation offer of compensation and a resolution of necessity are prerequisites to bringing an eminent domain action. (Gov. Code, § 7267.2; Code Civ. Proc., §§ 1240.040, 1245.230.)

[5] All references to "Guidelines" are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.). Section 15325 of the Guidelines provides the following exemption: "Class 25 consists of the transfers of ownership of interests in land in order to preserve open space, habitat, or historical resources. Examples include but are not limited to: [¶] (a) Acquisition, sale, or other transfer of areas to preserve the existing natural conditions, including plant or animal habitats. [¶] (b) Acquisition, sale, or other transfer of areas to allow continued agricultural use of the areas. [¶] (c) Acquisition, sale, or other transfer to allow restoration of natural conditions, including plant or animal habitats. [¶] (d) Acquisition, sale, or other transfer to prevent encroachment of development into flood plains. [¶] (e) Acquisition, sale, or other transfer to preserve historical resources. [¶] (f) Acquisition, sale, or other transfer to preserve open space or lands for park purposes."
The Guidelines are developed by the Office of Planning and Research and adopted by the Secretary of the Natural Resources Agency. (§ 21083.) " 'In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' [Citation.]" (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 128, fn. 7 [84 Cal.Rptr.3d 614, 194 P.3d 344] (*Save Tara*).)

Golden Gate objected to the proposed resolution. It asserted that the project was not exempt from CEQA and, thus, the District could not approve the project until after it reviewed and considered the environmental effects of trail construction and other improvements. Golden Gate also maintained that public necessity did not require condemnation because the public already had access to the property for recreational purposes, and because the least private injury and environmental harm would be achieved by planning this segment of the Bay Trail in conjunction with anticipated redevelopment of the property, which would also incur less public expense.

The District nonetheless approved the resolution of necessity, which was memorialized in resolution No. 2011-4-079. The resolution provides: "[The District] wishes to acquire certain real property rights described herein below for District use by the exercise of the power of eminent domain. [¶] . . . The acquisition of such rights is required to help to complete [Eastshore Park] and provide the opportunity to construct an important segment of the . . . Bay Trail. In addition, the acquisition will protect important natural resources and the visual integrity of the existing park. . . . [¶] . . . [¶] . . . The said real property rights are to be acquired for purposes of preservation of open space, habitat and natural conditions, pursuant to the authority granted in California Constitution, Article I, Section 19; . . . Sections 5540, 5541, 5541.1 and 5542; Title 7, Part 3 of the Code of Civil Procedure; and other provisions of law[.] [¶] . . . The public interest and necessity require the real property rights sought to be acquired[.] [¶] . . . The project is planned and located in the manner which will be most compatible with the greatest public good and the least private injury[.] [¶] . . . The real property rights described herein are necessary for the project . . . ."

The property described in the resolution includes (1) an area, totaling approximately 2.88 acres, which was to be taken in fee title and (2) "[a 4.88-acre] perpetual, non-exclusive easement . . . in order to construct, operate, and maintain a recreational trail . . . to be used by the general public for hiking, bicycling and equestrian use and other related uses." The District authorized its special counsel to prosecute the proceedings necessary and to acquire, in the District's name, the subject property by condemnation in accordance with the provisions of eminent domain law. The Board also directed staff to file a notice of exemption.

Two days later, the District posted a notice of exemption under CEQA stating that the District "has approved this project and found it to be exempt from [CEQA]," citing, inter alia, section 15325 of the Guidelines. Specifically, the notice of exemption provided: "The subject parcels are being acquired for the purpose of open space protection and future public access. The parcels total approximately 7.76 acres. [¶] . . . [¶] Reasons why project is

exempt from CEQA: This project consists of the acquisition of land in order to protect open space and to secure future public access to [Eastshore Park] and the . . . Bay Trail. Any development of this property and land use changes would be subject to future CEQA review."

On May 12, 2011, Golden Gate filed a petition for writ of mandate and complaint for injunctive relief, asserting that the District had violated CEQA and the eminent domain law. The CEQA count alleges that the District erroneously issued a notice of exemption, and because no exemption applies, the District was required to conduct CEQA review. In its eminent domain count, Golden Gate alleges that the District's resolution of necessity contained three statutory findings (that the public interest and necessity require acquisition of the real property, the project is planned/located in a manner most compatible with the greatest public good and the least private injury, and the real property rights are necessary for the project), all of which were unsupported by the evidence, thereby demonstrating the District's gross abuse of discretion. Golden Gate also alleges that the eminent domain law was violated because the District had irrevocably committed to the project before the hearing, and thereby abused its discretion. Golden Gate asked the superior court to vacate the District's adoption of the resolution of necessity.

In response, the District contended that the notice of exemption only applied to the acquisition of the property, not the construction of the Bay Trail, because the District had not committed itself to a definite course of action to build the Bay Trail.[6] The District also contended that there was no basis to halt the District's acquisition of the property, pursuant to section 15004 of the Guidelines. Finally, the District contended that substantial evidence supported its finding of public necessity.

Thereafter, the District filed an eminent domain action. A notice of related case was filed in the eminent domain action, and Golden Gate and the District stipulated that the mandate and eminent domain proceedings were related and

[6] The District relied on *Save Tara, supra*, 45 Cal.4th 116, in which our Supreme Court considered "whether and under what circumstances an agency's agreement allowing private development, conditioned on future compliance with CEQA, constitutes approval of the project . . . ." (*Id.* at p. 121.) The court concluded that "the City of West Hollywood's conditional agreement to sell land for private development, coupled with financial support, public statements, and other actions by its officials committing the city to the development, was, for CEQA purposes, an approval of the project that was required under sections 21100 and 21151 to have been preceded by preparation of an EIR." (*Save Tara*, at pp. 121–122.) Our Supreme Court announced that the critical question is "whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. (See [Guidelines], § 15126.6, subd. (e).)" (*Save Tara*, at p. 139.)

that the mandate proceeding should be heard before the eminent domain proceeding. The trial court ordered the eminent domain action to trail the mandate proceeding.

On May 8, 2012, the trial court filed a statement of decision and order granting, in part, Golden Gate's petition for a writ of mandate. The trial court concluded (1) that the District had approved a "project" including both the proposed acquisition and the proposed trail improvements; (2) that the District's resolution erroneously concluded the project was exempt from CEQA compliance; (3) that Golden Gate's challenges to the District's declaration of necessity for eminent domain lacked merit; and (4) that as for the relationship between CEQA approval and acquisition of real estate through eminent domain, while some authority suggests CEQA review must be completed before an eminent domain case is initiated, that approach was unpersuasive for various reasons.[7]

The court stated: "[T]he project is 'to acquire the real property' 'to help to complete the [Eastshore Park] and provide the opportunity to construct an important segment of the . . . Bay Trail.' . . . [¶] . . . [¶] . . . For CEQA purposes, the 'project' includes both the proposed acquisition and the proposed improvements, as addressing the two parts sequentially would be improper piecemealing of the project.[8] The proposed improvements are sufficiently definite given that [the District] considered three options for a trail site . . . , selected one, has a design and price estimate for the improvements . . . , and is now initiating the condemnation proceeding. [¶] . . . [¶] . . . Having selected the location of the trail, obtained engineering and costs studies for the trail, and initiated a proposed real estate acquisition that worked for that trail plan but not the alternatives, the [District] committed itself to a definite course of action in regard to the CEQA project. As a result, the [District] was required to state a CEQA exemption or describe CEQA compliance in the Resolution." The court concluded that no exemptions applied because "the project properly defined includes the building of the trail, the construction of fences, retaining walls, and drains, the loss of 133 parking spaces, and changes to existing roads."

---

[7] The District did not file a cross-appeal and thus we need not reconsider the court's first two determinations. (See *Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439 [100 Cal.Rptr.2d 501] ["[a]s a general matter, 'a respondent who has not appealed from the judgment may not urge error on appeal' "]; *Kardly v. State Farm Mut. Auto. Ins. Co.* (1995) 31 Cal.App.4th 1746, 1748, fn. 1 [37 Cal.Rptr.2d 612]; *Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 758, fn. 9 [33 Cal.Rptr.2d 137].)

[8] For CEQA purposes, a "project" is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment," and that is directly undertaken, financed, or permitted by a public agency. (§ 21065.) A "project" is "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Guidelines, § 15378, subd. (a).)

With respect to a remedy, the court determined that, pursuant to section 15004, subdivision (b)(2)(A) of the Guidelines, a public agency is permitted to initiate condemnation proceedings with "actual acquisition" conditioned on future CEQA compliance. Accordingly, pursuant to section 21168.9, subdivision (a), the court did not order the resolution of necessity to be vacated but instead allowed the District to proceed with its eminent domain action before completing CEQA review. It directed the District "to vacate the Resolution's conclusion that the project is exempt from CEQA" and "conduct an appropriate CEQA review." It reasoned that "the initiation of the eminent domain proceeding will not prejudice the consideration or implementation of particular mitigation measures or alternatives to the project." (Brackets omitted.) However, the trial court also ordered that the District "must not actually acquire the property without first completing compliance with CEQA."

The trial court concluded: "The court directs [the District] to vacate the Resolution's conclusion that the project is exempt from CEQA. [The District] must conduct an appropriate CEQA review of the CEQA project based on an appropriate definition of the project for CEQA purposes. Consistent with the definition of the project under [section] 21065, this must include an evaluation of different locations for the path and any proposed changes to the physical environment at any identified alternate locations. [¶] *The court does not direct [the District] to vacate the entire Resolution, and permits [the District] to proceed with an eminent domain action based on the resolution of necessity in the Resolution under [Code of Civil Procedure sections] 1240.030 and 1245.230(c). A public agency is permitted to adopt a declaration of necessity and to proceed with an eminent domain case before completing CEQA review and the court finds on the fact[s] of this case it is appropriate to permit [the District] to proceed with its eminent domain case before complying with CEQA.* [¶] The court orders that [the District] must not actually acquire the property without first completing compliance with CEQA. The court holds as a matter of law that [Guidelines] § 15004(a) precludes [the District] from actually acquiring the property prior to CEQA compliance." (Italics added.)

Judgment was entered on May 24, 2012. Golden Gate filed a timely notice of appeal.[9]

___

[9] Prior to the entry of judgment and its filing of a notice of appeal, Golden Gate unsuccessfully brought a motion to stay the eminent domain proceeding pending resolution of the CEQA action. Thereafter, Golden Gate filed a petition for writ of supersedeas seeking, in its prayer for relief, a writ of supersedeas directing the superior court to cease all proceedings in the eminent domain action during the pendency of the instant appeal. After briefing, we concluded that the automatic stay of Code of Civil Procedure section 916, subdivision (a), applies to the pending eminent domain action. (See *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189–190 [25 Cal.Rptr.3d 298, 106 P.3d 958].) We granted the petition for writ of supersedeas and stayed all proceedings in the eminent domain action.

## II. Discussion

On appeal, Golden Gate argues (1) that the trial court erred in refusing to set aside the resolution of necessity in its entirety, rather than simply the CEQA exemption finding and (2) that the District committed a gross abuse of discretion in finding that the prerequisites for eminent domain were satisfied. We find neither contention persuasive.

### A. CEQA Overview

" 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' ([Guidelines], § 15002)." (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 [142 Cal.Rptr.3d 539, 278 P.3d 803].) CEQA's purpose is to compel government to make decisions with environmental consequences in mind. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.) [¶] The second step of the process is required if the proposed activity is a 'project.' The public agency must then decide whether it is exempt from compliance with CEQA under either a statutory exemption (§ 21080) or a categorical exemption set forth in the regulations (§ 21084, subd. (a); [Guidelines], § 15300). A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.] If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.' (§ 21080, subd. (c); see [Guidelines], § 15070 . . . .) Otherwise, the agency must proceed to the third step, which entails preparation of an [EIR] before approval of the project. (§§ 21100, subd. (a), 21151, subd. (a).)" (*Tomlinson v. County of Alameda, supra*, 54 Cal.4th at p. 286, citation omitted.)

■ "[T]he EIR is the 'heart of CEQA.' [Citations.] 'Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR "protects not only the environment but also informed self-government." [Citation.]' [Citation.] To this end, public participation is an 'essential part of the CEQA process.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502], fn. omitted.) "[A]n EIR must consider the 'whole' of an action." (*Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1297 [152 Cal.Rptr.3d 888].)

B. *Mootness of the CEQA Argument*

During the pendency of this appeal, the District filed a request for judicial notice that asks the court to take judicial notice of two of its resolutions, dated November 20, 2012, in which it (1) certified an EIR for the project and (2) superseded and replaced its prior resolution of necessity. Golden Gate opposed the request, arguing that the resolutions are irrelevant and that the Evidence Code does not authorize judicial notice of such resolutions. Then, the District filed a supplemental request for judicial notice, asking that the court take judicial notice of its return to the peremptory writ of mandamus, filed in the trial court on December 27, 2012. The District's return showed (1) that it had certified an EIR for the project and (2) that it had vacated its original resolution of necessity and adopted a substitute resolution of necessity, which recited certification of the EIR. Both the EIR and the substituted resolution were attached as exhibits to the return. The District argues that the return is relevant "to show that [it] has complied with the writ of mandate issued by the trial court and that this appeal is now moot." Golden Gate continued to oppose the request, arguing that the return is irrelevant to its contention that the trial court's remedy violates CEQA.

■ We agree with Golden Gate that the District's return does not show that the present CEQA controversy is moot. "[A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 454 [66 Cal.Rptr.3d 120].) ■ Only relevant evidence is admissible by judicial notice. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [104 Cal.Rptr.2d 377, 17 P.3d 735].) Golden Gate is challenging the validity of the limited remedy ordered by the trial court, not whether the peremptory writ has been complied with. Golden Gate is arguing that any EIR completed *after* approval of the resolution of necessity is unlawful. Golden Gate maintains: "[T]he [trial] court correctly determined that the District violated CEQA by approving the project without reviewing its environmental effects, but erred in failing to set aside the District's

approval of the project and instead allowing the District to leave that approval intact and prepare an after-the-fact environmental impact report for the already approved project. [¶] . . . [¶] Assuming arguendo that the resolutions show, as the District claims, that it has complied with the writ of mandate, they are nonetheless irrelevant . . . since compliance with the limited remedy ordered in the writ cannot moot an appeal that challenges the legality of that very remedy." (Italics omitted.) Because we could still award the relief Golden Gate seeks—setting aside the District's resolutions—we conclude that the present controversy is not moot.[10] (See *Save Tara, supra,* 45 Cal.4th at p. 127 [preparation and certification of EIR did not render appeal moot].)

## C. *CEQA Remedy*

Golden Gate insists that the trial court imposed an improper remedy. It contends that, after concluding CEQA had been violated, the trial court was required to vacate the resolution of necessity in its entirety.

"The remedies for an agency's failure to comply with CEQA are governed by section 21168.9." (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 286 [148 Cal.Rptr.3d 310] (*Preserve Wild Santee*).) Section 21168.9 provides, in relevant part: "(a) If a court finds, as a result of a trial, hearing, or remand from an appellate court, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following: [¶] (1) A mandate that the determination, finding, or decision be voided by the public agency, *in whole or in part.* [¶] (2) If the court finds that a specific project activity or activities will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project, a mandate that the public agency and any real parties in interest suspend any or all specific project activity or activities, pursuant to the determination, finding, or decision, that could result in an adverse change or alteration to the physical environment, until the public agency has taken any actions that may be necessary to bring the determination, finding, or decision into compliance with this division. [¶] (3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance ·with this division. [¶] (b) *Any order pursuant to subdivision (a) shall include only those mandates which are necessary to achieve compliance with this division and only those specific project activities in noncompliance with this division.* The order shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is

---

[10] Because the requests for judicial notice are also relevant to Golden Gate's argument regarding compliance with eminent domain law, we address and rule on the requests in the unpublished portion of the opinion.

necessary to comply with this division. However, *the order shall be limited to* that portion of a determination, finding, or decision or *the specific project activity or activities found to be in noncompliance only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with this division, and (3) the court has not found the remainder of the project to be in noncompliance with this division.* The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division." (Italics added.)

A challenge to a limited writ remedy "raises two interrelated questions: whether the trial court properly interpreted section 21168.9 as authorizing the limited writ remedy and whether the trial court properly exercised its equitable powers in utilizing the remedy in this case. We review the trial court's interpretation of section 21168.9 de novo. We review the trial court's exercise of its equitable powers for abuse of discretion. [Citation.]" (*Preserve Wild Santee, supra,* 210 Cal.App.4th at p. 287.) " ' "An abuse of discretion occurs when, in light of applicable law and considering all relevant circumstances, the court's ruling exceeds the bounds of reason." ' [Citation.]" (*Id.* at p. 289.)

■ "The primary duty of a court when interpreting a statute is to give effect to the intent of the Legislature, so as to effectuate the purpose of the law. [Citation.] To determine intent, courts turn first to the words themselves, giving them their ordinary and generally accepted meaning. [Citation.] If the language permits more than one reasonable interpretation, the court then looks to extrinsic aids, such as the object to be achieved and the evil to be remedied by the statute, the legislative history, public policy, and the statutory scheme of which the statute is a part. [Citation.] . . . Ultimately, the court must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and it must avoid an interpretation leading to absurd consequences. [Citation.]" (*In re Luke W.* (2001) 88 Cal.App.4th 650, 655 [105 Cal.Rptr.2d 905].)

■ " ' " 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]" ' [Citation.]" (*Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].) "If the meaning of the statute remains unclear after examination of both the statute's plain language and its legislative history, then we proceed cautiously to . . .

apply 'reason, practicality, and common sense to the language at hand.' [Citation.]" (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 583 [48 Cal.Rptr.3d 340], citation omitted.)

### 1. *Background*

In imposing the remedy that it did, the trial court explained: "The law is not clear whether as a matter of law a public agency must, should, or simply can state a CEQA exemption or describe CEQA compliance when the public agency commences an eminent domain proceeding by adopting a resolution of necessity under [Code of Civil Procedure sections] 1240.030 and 1245.230(c).

"Some authority suggests that an agency must complete CEQA review before adopting a declaration of necessity and initiating an eminent domain case. In *City of San Jose v. Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1017, fn. 5 [237 Cal.Rptr. 845], the court states, 'Numerous commentators have concluded that at least since enactment of the 1976 Eminent Domain Law, compliance with CEQA is a precondition of the institution of eminent domain proceedings. [Citations.] Statements in the legislative record at the time of passage of the 1976 Eminent Domain Law confirm that the Legislature specifically intended that any environmental review required by CEQA or other statutes be included among the prerequisites to condemnation proceedings. (3 Assem. J. (1975 Reg. Sess.) p. 5190; 4 Sen. J. (1975 Reg. Sess.) p. 6539.)' See also *Burbank-Glendale-Pasadena Airport* [*Authority*] *v. Hensler* (1991) 233 Cal.App.3d 577[, 588,] fn. 1 [284 Cal.Rptr. 498].

"This approach is not persuasive. The legislature has not precluded an agency from commencing an eminent domain proceeding before CEQA compliance, and the court will not find that the legislature intended a bright line rule by implication. In addition, CEQA and eminent domain serve different purposes. CEQA concerns physical change in the environment, but is indifferent to whether a parcel of real estate is owned by one private party or another or by a government entity. On the facts of this case, for example, CEQA review would probably be required whether Golden Gate chose to build the shore path on its own property or the [District] chose to acquire property and build the shore path. Eminent domain, in contrast, concerns the ownership of the property. If the [District] chose to acquire the property but had no plans to change its use or to make physical changes, then CEQA review might not be required (*Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980 [63 Cal.Rptr.2d 244] [condemnation of land with no plans for physical changes does not require an EIR].)

"Other authority suggests that an agency can adopt a declaration of necessity, prosecute an eminent domain action, and obtain a value for the purchase of the property before complying fully with CEQA. [Guidelines] § 15004(b)(2)(B) [*sic*: (A)] states that a public agency 'may enter into land acquisition agreements when the agency has conditioned the agency's future use of the site on CEQA compliance.' If an agency can enter into a land acquisition agreement conditioned on future CEQA compliance, then an agency can presumably also initiate condemnation proceedings with actual acquisition of the property conditioned on future CEQA compliance. An agency may abandon the proposed acquisition at any time before the actual acquisition. [(Code Civ. Proc., § 1268.510.)]

"*The court finds that [Guidelines] § 15352(a) and (b)(2)(B) [sic] permit an agency to initiate condemnation proceedings with actual acquisition of the property conditioned on future CEQA compliance.* The Guidelines expressly precludes an 'acquisition' before CEQA approval in 15352(a) whereas it permits an 'acquisition agreement' before CEQA approval in 15352(b)(2)(B) [*sic*]. *An eminent domain proceeding is in the nature of the negotiation of an 'acquisition agreement'* that determines whether the public entity can 'acquire' the property through a forced sale and the price of the property."[11] (Italics added.)

The court further observed: "The court will permit the [District] to proceed with the eminent domain proceeding regarding the subject real estate before completing CEQA review. *The court has considered [section] 21168.9(a) in its decision.* Section 21168.9(a) permits the court to suspend 'any or all specific project activity' if the court determines that they could result in an adverse change or alteration to the physical environment before the public agency completes CEQA review. Paraphrasing 21168.9(a)(2), *the court 'finds that [the initiation of the eminent domain proceeding] will [not] prejudice the consideration or implementation of particular mitigation measures or alternatives to the project,* [and as a result, the court will not] mandate that the [District] suspend [that] project activity [because the court finds that the initiation of the eminent domain proceeding will not] result in an adverse change or alteration to the physical environment.'

"The court has also considered [section] 21168.9(b) and the three criteria for permitting a project to proceed in part. The court makes the following findings:

---

[11] It seems clear that the trial court intended to refer to Guidelines section 15004, subdivisions (a) and (b)(2)(A) rather than Guidelines section 15352, subdivisions (a) and (b)(2)(B).

"a. *The Resolution and the [District]'s prosecution of the eminent domain action are severable from the actual purchase of the real estate and the design and construction of the project*;

"b. Severance of the portion of the project including adoption of the Resolution and the prosecution of the eminent domain action from the other portions of the project consisting of the actual purchase of the real estate and the design and construction of the project will not prejudice the completion of an appropriate environmental document because by prosecuting the eminent domain action the [District] has not limited its legal obligation to consider all project alternatives and the [District] must provide full compliance with CEQA prior to actual acquisition and construction; and

"c. *The court has not found the portion of the project consisting of the [District's] acquisition of property to be in noncompliance with CEQA.*

"In permitting the [District] to proceed with the eminent domain action, the court adopts and paraphrases the concerns of the Supreme Court in [*Laurel Heights I, supra,*] 47 Cal.3d [at page] 425: 'We emphasize that [the eminent domain proceeding] we are allowing to continue [will not] serve as a proper basis for rejecting feasible alternatives to the [shoreline path] site. We shall not countenance any attempt to reject an alternative on the ground that the [shoreline path] site has already been [the subject of eminent domain proceeding]. [The District] must begin anew the analytical process required under CEQA.' The [District]'s CEQA evaluation of potential alternatives to the shore path at the identified location must be on the merits of the CEQA analysis and without regard to the prosecution of the eminent domain action or the consequences of abandoning that course of action." (Italics & some brackets added.)

### 2. *Analysis*

Golden Gate contends: "[T]he court did not order the District to vacate the invalid resolution, but rather devised a remedy unknown to CEQA: allowing the District to leave its approval of the project intact and ordering the District to perform an after-the-fact review of the approved project's environmental effects before the District proceeds either to build the project or change its mind and pursue an alternative. [¶] This remedy is antithetical to both CEQA and the Eminent Domain Law. CEQA specifically requires environmental review *before* project approval so as to inform the agency's decision making process." We understand Golden Gate to be arguing that the trial court was without authority, in this case, to issue a limited writ. We review the trial court's interpretation of section 21168.9 de novo. (*Preserve Wild Santee, supra,* 210 Cal.App.4th at p. 287.)

The issue in this case is not whether an EIR has to be prepared. The District has now conceded as much. Instead, we consider when an EIR must be prepared in a case where CEQA and eminent domain law intersect. Some authority suggests CEQA review must be completed *before* an eminent domain case is initiated. (See *City of Stockton v. Marina Towers LLC* (2009) 171 Cal.App.4th 93, 108 [88 Cal.Rptr.3d 909] (*City of Stockton*); *Burbank-Glendale-Pasadena Airport Authority v. Hensler, supra,* 233 Cal.App.3d at pp. 595–596 (*Airport Authority*); *City of San Jose v. Great Oaks Water Co., supra,* 192 Cal.App.3d at p. 1017, fn. 5 (*City of San Jose*).)

■ However, in this case, the trial court determined that it was not required to vacate the entire resolution of necessity while the District prepared an EIR. It relied on section 21168.9, which "was enacted in 1984 to give the trial courts some flexibility in tailoring a remedy to fit a specific CEQA violation.[12] [Citations.] . . . [¶] Section 21168.9 . . . gives trial courts the option to void the finding of the agency (§ 21168.9, subd. (a)(1)), or to order a lesser remedy which suspends a specific project activity which could cause an adverse change in the environment (§ 21168.9, subd. (a)(2)), or to order specific action needed to bring the agency's action into compliance with CEQA (§ 21168.9, subd. (a)(3)). The choice of a lesser remedy involves the trial court's consideration of equitable principles. [Citations.]" (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (2001) 89 Cal.App.4th 1097, 1103–1104 [109 Cal.Rptr.2d 108].) "The 1993 amendments to section 21168.9 expanded the trial court's authority and 'expressly authorized the court to fashion a remedy that permits some part of the project to go forward while an agency seeks to remedy its CEQA violations. In other words, the issuance of a writ need not always halt all work on a project.' (Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999)

---

[12] As originally enacted, section 21168.9 provided: "(a) If a court finds, as a result of a trial, hearing, or remand from an appellate court, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following: [¶] (1) A mandate that the determination, finding, or decision be voided by the public agency. [¶] (2) A mandate that the public agency and any real parties in interest suspend all activity, pursuant to the determination, finding, or decision, that could result in any change or alteration to the physical environment, until the public agency has taken such actions as may be necessary to bring the determination, finding, or decision into compliance with this division. [¶] (3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division. [¶] (b) Any order pursuant to subdivision (a) shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with this division. The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division. [¶] (c) Nothing in this section authorizes a court to direct any public agency to exercise its discretion in any particular way. [¶] (d) This section applies to any matter pending before any court on or after January 1, 1985, in which the court has not, on or before that date, entered its order determining whether the public agency has acted in accordance with this division." (Stats. 1984, ch. 1213, § 1, p. 4161.)

p. 647.) [¶] Under the current version of section 21168.9, subdivision (a), the trial court may allow a portion of the work to proceed while the agency is complying with CEQA. Under subdivision (a)(1), the trial court may void the action of the public agency in whole or in part." (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.*, at pp. 1104–1105.)

Our Supreme Court first interpreted the original version of section 21168.9 in *Laurel Heights I, supra*, 47 Cal.3d 376. In that case, the high court determined that an EIR, prepared in connection with the relocation of biomedical research facilities at the University of California campus in San Francisco, was inadequate in that it failed to discuss future expansion by its school of pharmacy into space that was leased to a third party for several more years. It otherwise rejected arguments that the EIR was inadequate with respect to existing laboratory activities at the site. (*Id.* at pp. 387–389, 393.) In considering whether the university should be allowed to continue construction pending certification of a proper EIR, the court said: "Section 21168.9 grants us the authority to stay all activity at Laurel Heights until the Regents certify a proper EIR. The question is whether we should do so. [¶] Because CEQA does not require us to enjoin the present activity, we rely on traditional equitable principles in deciding whether injunctive relief is appropriate." (*Laurel Heights I*, at p. 423.) In light of its conclusion that substantial evidence supported the finding that the university's current activities would be mitigated, the court held that the university could continue operations it had already begun, but could not expand operations or begin additional operations until a new EIR was certified. (*Id.* at p. 424.) But the court also noted: "We can reasonably assume the Association and the trial court will closely monitor the Regents' progress in complying with our decision. Such oversight is an additional assurance a new EIR will be completed without undue delay. Should it become clear, however, that the Regents cannot or will not prepare and certify a legally adequate EIR and that compliance with CEQA will not be promptly forthcoming, the trial court can reconsider the question of whether equitable relief terminating operations at Laurel Heights is then appropriate." (*Ibid.*, fn. omitted.)

Section 21168.9 was also considered and discussed in *City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438 [263 Cal.Rptr. 340] (*City of Santee*). In *City of Santee*, the Fourth District Court of Appeal concluded that the County of San Diego's EIR for expansion of a detention facility was inadequate, but that it could continue to use the facility pending certification of a new EIR. (*Id.* at pp. 1440–1441, 1455–1456.) The court reasoned: "Recognizing the emergency situation concerning countywide jail overcrowding and the good faith attempt of the county to comply with court limits on that overcrowding and the closing of the Vista detention facility, and in light of the ongoing permanent jail expansion projects, we believe CEQA will not be thwarted by allowing the existing temporary detention facility to remain at

Las Colinas pending the new EIR process. We believe the County has the good faith and ability to prepare an EIR that complies with CEQA and that they will proceed apace to do so. We also reasonably assume Santee and the trial court will closely monitor the County's progress in complying with our decision. The trial court can reconsider the question of whether equitable relief terminating the expansion at Las Colinas is appropriate if there is evidence that the County cannot or will not prepare and certify a legally adequate EIR or is dragging its feet in doing so. [¶] Because the temporary project has not gone past its prescribed limit of seven years, there is no evidence the environment is being adversely affected beyond the scope of the present EIR. As the defects in the EIR relate to future activities that the EIR failed to address, as it relates to the description of the project and the feasible alternatives and mitigating measures, the general public might be unduly prejudiced if we were to enjoin the use of the expanded Las Colinas facility. Thus we hold the County may continue use of that facility until a new EIR is certified and the project reapproved by the Board." (*Id.* at p. 1456.)

Golden Gate contends that the above cases are distinguishable because "[t]hey deal with situations where the lack of CEQA compliance was partial or only affected one part of a project." Golden Gate maintains: "[S]ection 21168.9(b) would not authorize severance . . . since none of the three requisite findings can properly be made under the circumstances presented here. . . . [¶] . . . [¶] . . . [O]ne is hard put to imagine how a portion of the District's 'approval' of the project can be severed from the entirety of that approval." But section 21168.9, subdivision (b), discusses severance of "project activities." It provides: "Any order pursuant to subdivision (a) shall include only those mandates which are necessary to achieve compliance with this division and *only those specific project activities in noncompliance* with this division. . . ." (*Ibid.*, italics added.) Here, the trial court was clear that the CEQA project in this case was composed of three different "project activities"—initiation of the eminent domain proceedings, actual acquisition of the property rights (both fee title and easement), and the proposed improvements. (See § 21168.9.) And the trial court concluded that only the last project activity was in noncompliance with CEQA. It also found that initiation of the eminent domain proceedings was a severable project activity that would not result in an adverse change to the physical environment and would not prejudice CEQA compliance, so long as the District stopped short of actual acquisition. Thus, just as in *Laurel Heights I* and *City of Santee,* the trial court allowed severable, existing project activity to go forward (initiation of the eminent domain proceedings) while CEQA defects relating to future project activities (the proposed improvements) were remedied.

Golden Gate also contends that the above cases are distinguishable because, in this case, no EIR was completed before approval of the resolution of necessity. Golden Gate argues: "Where, as here, the agency has not

conducted *any* environmental review under CEQA with respect to any aspect of the project, *a fortiori*, such severance and limited relief is not appropriate. Since the District has not conducted any environmental review at all, no portion of its approval or project can conceivably be in compliance with CEQA."

We reject Golden Gate's proposed distinction. First, section 21168.9 contains no textual requirement that environmental review be completed before consideration of the severance remedy. It only provides, in subdivision (b): "[*T*]*he order shall be limited to* that portion of a determination, finding, or decision or *the specific project activity or activities found to be in noncompliance* only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with this division, and (3) *the court has not found the remainder of the project to be in noncompliance with this division*." (*Ibid.*, italics added.) It may be true that, as Golden Gate puts it, "no portion of the project has been reviewed under CEQA." And at least one court has noted that when an agency "has not conducted any environmental review in connection with the project [that] formed the basis of [the resolution of necessity, a reviewing court] is not in any position to evaluate the environmental consequences of proceeding with the project." (*Airport Authority, supra*, 233 Cal.App.3d at p. 596; see *County of Amador v. City of Plymouth* (2007) 149 Cal.App.4th 1089, 1114 [57 Cal.Rptr.3d 704] [making similar distinction].)

However, Golden Gate also overlooks that it is undisputed that an EIR is not required to condemn property for open space or park purposes alone. (See *Silveira v. Las Gallinas Valley Sanitary Dist., supra*, 54 Cal.App.4th at pp. 983–984 [CEQA does not mandate preparation of an EIR where condemnation would not alter the natural state of condemned property]; *Cathay Mortuary, Inc. v. San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 278–281 [254 Cal.Rptr. 778] [condemnation of mortuary to create park did not require EIR because it would have no significant adverse effect on environment]; Guidelines, § 15325.) Accordingly, the trial court stated, in its statement of decision, that it had "not found the portion of the project consisting of the [District's] acquisition of property to be in noncompliance with CEQA."

The trial court did say that, for CEQA project definition purposes, "the 'project' includes both the proposed acquisition and the proposed improvements, as addressing the two parts sequentially would be improper piecemealing of the project." Thus, Golden Gate argues that the trial court's reasoning is inconsistent. But the merits of the trial court's ruling on CEQA project approval are not before us. More importantly, the plain language of

the statute is not susceptible of the meaning Golden Gate suggests. Golden Gate suggests that the resolution of necessity, as a whole, must be voided. A similar argument was rejected in *Preserve Wild Santee, supra,* 210 Cal.App.4th at page 289. In that case the reviewing court observed: "[A] reasonable, commonsense reading of section 21168.9 plainly forecloses plaintiffs' assertion that a trial court must mandate a public agency decertify the EIR and void all related project approvals in every instance where the court finds an EIR violates CEQA. Such a rigid requirement directly conflicts with the 'in part' language in section 21168.9, subdivision (a)(1), which specifically allows a court to direct its mandates to parts of determinations, parts of findings, or parts of decisions. Such a rigid requirement also conflicts with the language in section 21168.9, subdivision (b), limiting the court's mandates to only those necessary to achieve CEQA compliance and, if the court makes specified findings, to only 'that *portion* of a determination, finding, or decision' violating CEQA." (*Preserve Wild Santee,* at p. 288.) We agree that we cannot simply ignore the plain language of the statute. In section 21168.9, the Legislature chose to focus on "project activities," rather than the "project" as a whole.

Furthermore, the facts of this case are unique. We are considering a project for open space preservation and recreational improvements. For these reasons, Golden Gate's reliance on *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713 [32 Cal.Rptr.2d 704] (*San Joaquin Raptor*) and *Airport Authority, supra,* 233 Cal.App.3d 577, is misplaced.[13]

In *San Joaquin Raptor, supra,* 27 Cal.App.4th 713, Stanislaus County prepared an EIR in connection with approving a residential and commercial development project. The final EIR was inadequate because it failed to adequately describe the environmental setting, alternatives, or cumulative effects of the project. (*Id.* at pp. 718–719, 728–740.) The reviewing court also concluded that injunctive relief was necessary. It reasoned: "First, the [final EIR] is a mass of flaws. Beginning with an incomplete project description, continuing with an inaccurate and misleading description of the site followed by an inadequate discussion of alternatives and concluding with an incomplete and conclusionary discussion of the cumulative effects of the development project, the [final EIR] fails to comply with CEQA in all major respects. If an injunction is not issued, surveying and construction may commence absent any meaningful exploration and public disclosure of the true scope of

---

[13] Golden Gate's reliance on *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184 [22 Cal.Rptr.3d 203] (*Bakersfield*) is also misplaced. The *Bakersfield* court noted that "[n]o discrete or severable aspects of the projects are unaffected by the omitted analyses; the defects relate to the shopping centers in their entirety, not just to one specific retailer." (*Id.* at p. 1221.) But it did not analyze the selection of a remedy pursuant to section 21168.9. (*Bakersfield,* at pp. 1220–1221.)

the development project, its sensitive environmental setting, environmental impacts or feasible alternatives. It is all too likely that if such activities proceed pending preparation of an adequate EIR, momentum will build and the project will be approved, no matter how severe the environmental consequences identified in the new EIR. Consideration of alternative sites or density or additional mitigation measures, such as a larger buffer zone or different location or configuration of the proposed park site will be prejudiced, for the development project will have proceeded well beyond the planning stages and change will be both more difficult to effect and less likely to occur." (*San Joaquin Raptor*, at pp. 741–742, fn. omitted.) The court also stated: "The noncompliance *tainted the analysis of the entire development* project and not just one severable portion. Therefore, cases such as *Laurel Heights [I]*, *supra*, 47 Cal.3d at pages 422–425 and [*City of Santee*], *supra*, 214 Cal.App.3d at pages 1455–1457, . . . are inapposite. In [*Laurel Heights I*] and *City of Santee* the defects in the EIR related only to future activities and feasible alternatives both of which were determined to be discrete and severable issues. Here, the vast array of inadequacies in the [final EIR] precludes severance." (*San Joaquin Raptor*, at p. 742, fn. 13, italics added.)

In *Airport Authority*, *supra*, 233 Cal.App.3d 577, a local airport authority appealed from a judgment dismissing its action in eminent domain after its resolution of necessity was voided for failure to comply with CEQA. (233 Cal.App.3d at p. 582.) In 1985, the airport authority had approved the extension of an existing taxiway on its own land, and adopted a negative declaration. In 1989, it passed a new resolution, proposing to complete the taxiway project by condemning property belonging to a neighbor. The airport authority never considered whether the condemnation required further compliance with CEQA. (233 Cal.App.3d at pp. 583–585.)

On appeal, the authority contended, inter alia, that the trial court abused its discretion in failing to allow its condemnation proceedings to continue. (*Airport Authority*, *supra*, 233 Cal.App.3d at p. 582.) The reviewing court concluded that there was no evidence that the authority ever conducted a threshold initial study under CEQA of its project—constructing a taxiway on the condemned property. (233 Cal.App.3d at p. 594.) The court observed: "Unlike the university in [*Laurel Heights I*], appellant has not conducted any environmental review in connection with the project which formed the basis of [its resolution of necessity], so this court is not in any position to evaluate the environmental consequences of proceeding with the project. Further, appellant has not yet begun any activities on Hensler's property. Appellant fails to bring to our attention any equitable considerations which justify an order permitting it to proceed with the eminent domain action under the circumstances of this case. On the other hand, there are many equitable concerns which militate against the disposition propounded by appellant,

which disposition would constitute an affront to the integrity of the decision-making process required by CEQA. [¶] . . . [¶] In the instant case, neither the Authority's commissioners nor the public were informed about the environmental effects, or lack thereof, of the project which was the basis of [the resolution of necessity]. The public has not yet had an opportunity to review such project. *Moreover, Guidelines section 15004, subdivision (b)(1) states that 'CEQA compliance should be completed prior to acquisition of a site for a public project.'* [¶] Accordingly, we conclude the trial court did not abuse its discretion in dismissing the eminent domain action. We also find insufficient grounds to permit Authority to proceed without CEQA compliance, *in direct contravention of Guidelines section 15004, subdivision (b)(1)."* (*Airport Authority*, at p. 596, italics added.)

*Airport Authority, City of San Jose, City of Stockton*, and *San Joaquin Raptor* are distinguishable because in none of those cases was the project composed, in part, of condemnation of property to preserve open space or lands for park purposes. Rather, the project was for the *sole* purpose of making a change to the physical environment. (*City of Stockton, supra*, 171 Cal.App.4th at pp. 100–102; *San Joaquin Raptor, supra*, 27 Cal.App.4th at pp. 718, 741–742 [residential development]; *Airport Authority, supra*, 233 Cal.App.3d at pp. 583–584 [construction of airport taxiway]; *City of San Jose, supra*, 192 Cal.App.3d at p. 1028 [expansion of water service system].) Thus, the equities did not weigh in favor of allowing construction or condemnation proceedings to go forward pending preparation of an adequate EIR.

 Here, on the other hand, there is no evidence that, by continuing its eminent domain proceedings, the District was going to be prejudiced in its "consideration or implementation of particular mitigation measures or alternatives to the [proposed improvements]" or that the eminent domain proceedings "could result in an adverse change or alteration to the physical environment." (§ 21168.9, subd. (a)(2).) There is no danger that construction of the improvements will begin without exploration of their environmental impact. And there is no danger that the District will be pressured to overlook adverse environmental consequences of a particular trail alignment because it has already spent millions of dollars acquiring the subject property rights. In fact, the trial court specifically ordered that no acquisition would take place until CEQA review was complete. Presumably some public funds have been expended in initiating the eminent domain proceedings. But there is nothing in the record to suggest that the District has expended a sum considered "a strong incentive to ignore environmental concerns." (*County of Amador v. City of Plymouth, supra*, 149 Cal.App.4th at p. 1106 [Indian tribe agreed to pay city millions of dollars, at least some of which would be paid before environmental review completed].) And, if we were to reverse the trial court's judgment, the public funds expended would not be reimbursed, nor would the District artificially go back to square one in its analysis of trail alternatives.

The Legislature has directed "the district to act in an expeditious manner towards the acquisition, planning, and development of [a *contiguous* shoreline park and bay trail along the east shore of the San Francisco Bay]." (§ 5003.03.)

Furthermore, at the time *Airport Authority* was decided, Guidelines section 15004, subdivision (b)(2)(A), did not exist.[14] Section 15004 of the Guidelines provides in relevant part: "(a) *Before granting any approval of a project subject to CEQA,* every lead agency or responsible agency shall consider a final EIR or negative declaration or another document authorized by these guidelines to be used in the place of an EIR or negative declaration. See the definition of 'approval' in Section 15352. [¶] (b) Choosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment. [¶] (1) With public projects, at the earliest feasible time, project sponsors shall incorporate environmental considerations into project conceptualization, design, and planning. *CEQA compliance should be completed prior to acquisition of a site for a public project.* [¶] (2) To implement the above principles, public agencies shall not undertake actions concerning the proposed public project that would have a significant adverse effect or limit the choice of alternatives or mitigation measures, before completion of CEQA compliance. For example, agencies shall not: [¶] (A) Formally make a decision to proceed with the use of a site for facilities which would require CEQA review, regardless of whether the agency has made any final purchase of the site for these facilities, *except that agencies may designate a preferred site for CEQA review and may enter into land acquisition agreements when the agency has conditioned the agency's future use of the site on CEQA compliance.*" (Italics added.)

 ·Guidelines section 15004, subdivision (b)(2)(A), makes clear that a public agency may designate a preferred site for facilities requiring CEQA review, and enter into agreements to acquire the site, so long as future use of the site is conditioned on CEQA compliance. (See *Stand Tall on Principles v.*

---

[14] The District asserts that "[w]hen it adopted its Resolution of Necessity, the District relied on a provision in the CEQA [Guidelines] (. . . § 15004(b)(2)(A)) . . . ." However, section 15004 of the Guidelines is not cited anywhere in the resolution of necessity or the notice of exemption. However, the fact that Guidelines section 15004, subdivision (b)(2)(A) was not listed does not necessarily preclude the District from raising it before the trial court, "at least where there is no claim or showing of prejudice." (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 190–191 [49 Cal.Rptr.3d 169].)

*Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 781 [1 Cal.Rptr.2d 107] (*Stand Tall*) [school district's authorization to purchase real property for a new school site, specifying that any offer to purchase was to be made contingent on completion of EIR, did not constitute CEQA "approval" because it did not commit district to a definite course of action].)[15]

Although we deal with eminent domain proceedings rather than an acquisition agreement, we conclude that the remedy imposed by the trial court is indistinguishable from the timing of review envisioned by Guidelines section 15004, subdivision (b)(2)(A). In its statement of decision, the trial court stated: "The [District's] CEQA evaluation of potential alternatives to the shore path at the identified location must be on the merits of the CEQA analysis and without regard to the prosecution of the eminent domain action or the consequences of abandoning that course of action." If there is any question regarding the District's good faith in preparing the EIR, such concerns will be addressed by the trial court.

The trial court did not err in interpreting section 21168.9. Nor did the trial court abuse its discretion in exercising its equitable powers.

### D. *Compliance with Eminent Domain Law**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[15] In *Save Tara, supra,* 45 Cal.4th at pages 133–134, our Supreme Court distinguished, but did not overrule *Stand Tall* on this point. The *Save Tara* court explained: "Without questioning the correctness of *Stand Tall* . . . on [its] facts, we note that [it] involved particular circumstances limiting the reach of its logic; [*Stand Tall* does not] convince[] us a broad rule exists permitting EIR preparation to be postponed *in all circumstances* by use of a CEQA compliance condition. [¶] . . . [¶] *Stand Tall, supra,* 235 Cal.App.3d 772, involved an agreement to purchase property, an activity that, as a practical matter in a competitive real estate market, may sometimes need to be initiated before completing CEQA analysis. The CEQA Guidelines accommodate this need by making an exception to the rule that agencies may not 'make a decision to proceed with the use of a site for facilities which would require CEQA review' before conducting such review; the exception provides that 'agencies may designate a preferred site for CEQA review and may enter into land acquisition agreements when the agency has conditioned the agency's future use of the site on CEQA compliance.' ([Guidelines], § 15004, subd. (b)(2)(A).) The Guidelines' exception for land purchases is a reasonable interpretation of CEQA, but it should not swallow the general rule (reflected in the same regulation) that a development decision having potentially significant environmental effects must be *preceded,* not *followed,* by CEQA review. [Citation.]" (*Save Tara,* at pp. 133–134, first italics added.)

*See footnote, *ante,* page 353.

## III. Disposition

The judgment is affirmed. The District is to recover its costs on appeal. The stay is dissolved upon the finality of the opinion as to this court.

Jones, P. J., and Needham, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 26, 2013, S210878.